FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| BRIAN MECINAS; CAROLYN VASKO; DNC SERVICES CORPORATION, DBA Democratic National Committee; DSCC; PRIORITIES USA; PATTI SERRANO, *Plaintiffs-Appellants*, | No. 20-16301 D.C. No. 2:19-cv-05547- DJH |
| v. | OPINION |
| KATIE HOBBS, the Arizona Secretary of State, *Defendant-Appellee.* | |

Appeal from the United States District Court
for the District of Arizona
Diane J. Humetewa, District Judge, Presiding

Argued and Submitted January 14, 2022
Pasadena, California

Filed April 8, 2022

Before: Johnnie B. Rawlinson and Paul J. Watford, Circuit
Judges, and Jed S. Rakoff,* District Judge.

Opinion by Judge Rakoff

---

* The Honorable Jed S. Rakoff, United States District Judge for the
Southern District of New York, sitting by designation.

**SUMMARY**[**]

**Civil Rights**

The panel reversed the district court's dismissal of a complaint challenging Arizona's Ballot Order Statute, A.R.S. § 16-502, which requires that, in each county, candidates affiliated with the political party of the person who received the most votes in that county in the last gubernatorial race be listed first on the general election ballot.

Plaintiffs, three Arizona voters and three organizations, including the Democratic National Committee, brought this action against the Arizona Secretary of State alleging that the Ballot Order Statute violates the First and Fourteenth Amendments because it gives candidates the benefit of appearing first on the ballot, not on the basis of some politically neutral ordering (such as alphabetically or by lot), but on the basis of political affiliation. Plaintiffs allege that, for most of the elections that have occurred in Arizona since the Ballot Order Statute was enacted, the Republican Party's candidates have appeared in the top position in the great majority of Arizona's general election ballots solely as a result of their political affiliation. Plaintiffs allege that the candidate whose name appears first on a ballot in a contested race receives the benefit resulting from a recognized psychological phenomenon known as "position bias" or the "primacy effect."

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The district court dismissed the complaint on the basis that plaintiffs lack standing and that the complaint presented a nonjusticiable political question. The panel held that the district court erred in dismissing the suit on these grounds. Specifically, the panel held at least one of the plaintiffs—the DNC—had standing to bring this suit. The panel held that: (1) the DNC satisfied the injury in fact requirement on the basis of its competitive standing; (2) the challenged law was traceable to the Secretary; and (3) having shown that an injunction against the Secretary would significantly increase the likelihood of relief, plaintiffs met their burden as to redressability.

The panel held that plaintiffs' claims did not present a nonjusticiable political question and that the district court overlooked the narrow scope of the Supreme Court's decision in *Rucho v. Common Cause*, 139 S. Ct. 2484, 2491 (2019). Adjudicating a challenge to a ballot order statute did not present the sort of intractable issues that arise in partisan gerrymandering cases.

The panel rejected the Secretary's argument that the district court's dismissal could be affirmed on the alternative ground that she was not the proper defendant under Article III or the Eleventh Amendment. Finally, the panel held that plaintiffs had stated a claim sufficient to survive a motion to dismiss. The magnitude of the asserted injury was a function of the "primacy effect," presenting factual questions that could not be resolved on a motion to dismiss.

**COUNSEL**

Abha Khanna (argued), Elias Law Group LLP, Seattle, Washington; Marc Elias, Elisabeth C. Frost, and John M. Geise, Elias Law Group LLP, Washington, D.C.; for Plaintiffs-Appellants.

Kristen Michelle Yost (argued), Coppersmith Brockelman LLP, Phoenix, Arizona; Kara M. Karlson, Assistant Attorney General; Linley Wilson, Deputy Solicitor General; Office of the Attorney General, Phoenix, Arizona; for Defendant-Appellee.

**OPINION**

RAKOFF, District Judge:

In Arizona the state's Ballot Order Statute, A.R.S. § 16-502, requires that, in each county, candidates affiliated with the political party of the person who received the most votes in that county in the last gubernatorial race be listed first on the general election ballot. In 2019, three Arizona voters, Brian Mecinas, Carolyn Vasko, and Patti Serrano, and three organizations, the Democratic National Committee (the "DNC"), the Democratic Senatorial Campaign Committee (the "DSCC"), and Priorities USA ("Priorities"), a political action committee (collectively, the "Plaintiffs"), brought this action against Katie Hobbs, in her official capacity as the Arizona Secretary of State (the "Secretary"), claiming that the Ballot Order Statute violates the First and Fourteenth Amendments because it gives candidates the benefit of appearing first on the ballot, not on the basis of some politically neutral ordering (such as alphabetically or by lot), but on the basis of political affiliation. Specifically, Plaintiffs

allege that, for most of the elections that have occurred in Arizona since the Ballot Order Statute was enacted, the Republican Party's candidates have appeared in the top position in the great majority of Arizona's general election ballots solely as a result of their political affiliation.

Without addressing the merits of Plaintiffs' argument, the district court dismissed their complaint at the pleading stage based on jurisdictional challenges raised by the Secretary, *viz.*, that Plaintiffs lack standing and that the complaint presents a nonjusticiable political question. Plaintiffs now appeal, arguing that the district court erred in dismissing their suit on these grounds. We agree. Specifically, we hold that at least one of the plaintiffs—the DNC—has standing to bring this suit and that Plaintiffs' claims do not present a nonjusticiable political question. We also reject the Secretary's argument that the district court's dismissal can be affirmed on the alternative ground that she is not the proper defendant under Article III or the Eleventh Amendment. Finally, we hold that Plaintiffs have stated a claim sufficient to survive a motion to dismiss. We therefore reverse the dismissal of the complaint and remand for further proceedings.

## BACKGROUND

In 1979, the Arizona legislature enacted A.R.S. § 16-502, the Ballot Order Statute. The Ballot Order Statute establishes the order in which candidates appear on the ballot in general elections in each of Arizona's fifteen counties. The statute mandates a tiered system of organizing the names on the ballot. First, names of candidates are listed according to their political party, "in descending order according to the votes cast for governor for that county in the most recent general election for the office of governor." *Id.* § 16-502(E). Next, candidates affiliated with political parties

that did not have candidates on the ballot in the last general election are "listed in alphabetical order below the parties that did have candidates on the ballot in the last general election." *Id.* Third are the names of candidates who were nominated but are not registered with a recognized political party. *Id.* A space for write-in candidates is listed last. *Id* § 16-502(G).

Under this statutory organization scheme, the candidates of the political party that received the most votes in the most recent gubernatorial election in that county appear first in all races and on all ballots in that county. According to Plaintiffs' complaint, the result of these rules has been that in all but a handful of general elections since the statute was enacted the vast majority of Arizona's voting population received a ballot with the Republican Party's candidates in the top position. The complaint further alleges that a candidate whose name appears first on a ballot in a contested race receives an unfair electoral advantage based on political affiliation—specifically, the benefit resulting from a recognized psychological phenomenon known as "position bias" or the "primacy effect."

Plaintiffs filed this action on November 1, 2019. Shortly thereafter, Plaintiffs amended their complaint and moved for a preliminary injunction in advance of the November 2020 election in Arizona. The Secretary opposed the preliminary injunction motion and filed a separate motion to dismiss.

In March 2020, the district court held a two-day evidentiary hearing on Plaintiffs' preliminary injunction motion—at which Plaintiffs' two experts, Dr. Jonathan Rodden and Dr. Jon Krosnick, and the Secretary's expert, Mr. Sean Trende, testified regarding the statistical modeling of the "primacy effect"—and heard oral argument on both the motion for preliminary injunction and the motion to

dismiss. While both motions were still pending, the district court, on June 2, 2020, ordered the parties to submit a joint letter as to whether they would agree to deem the preliminary injunction hearing to also constitute a trial on the merits. Shortly thereafter, on June 8, 2020, the parties submitted a responsive letter stating that they would not so agree.

On June 25, 2020, the district court granted the motion to dismiss with prejudice, holding that Plaintiffs lack standing and, independently, that their claims present nonjusticiable political questions. The court did not reach the merits of Plaintiffs' claims.

Plaintiffs timely noticed an appeal and moved for an injunction pending appeal, which the district court denied. With the 2020 election approaching, Plaintiffs moved this Court for an emergency injunction pending appeal. That motion was denied by the motions Panel in a brief order. Briefing and oral argument on Plaintiffs' appeal followed.

## STANDARD OF REVIEW

"We review *de novo* dismissal for lack of subject matter jurisdiction and may affirm on any basis supported by the record." *Zuress v. Donley*, 606 F.3d 1249, 1252 (9th Cir. 2010).[1] When "deciding standing at the pleading stage, and for purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."

---

[1] Unless otherwise specified, all internal quotation marks, citations, omissions, emphases, and alterations are omitted from all sources cited herein.

*Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1178 (9th Cir. 2000).

It is true that there is an exception to this general rule where the defendant brings a motion under Rule 12(b)(1) challenging subject matter jurisdiction as a factual—rather than facial—matter. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). At that point, the court may resolve any factual disputes concerning the existence of jurisdiction. *See Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). "However, where the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial." *Id.*

Here, the Secretary's motion was based solely on the allegations in Plaintiffs' amended complaint. It thus did not convert the motion to dismiss into a factual motion. And while the district court held an evidentiary hearing on the Plaintiff's preliminary injunction, there is nothing in the record to indicate that the court, *sua sponte*, converted it into

a hearing on standing. As such, we properly consider this motion based solely on the allegations in the complaint.[2]

## DISCUSSION

A. *Standing*

Article III of the U.S. Constitution limits federal court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1.  As the Supreme Court has explained, "the 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Allen v. Wright*, 468 U.S. 737, 750 (1984). "[S]everal doctrines [] have grown up to elaborate that requirement," including "mootness, ripeness, political question, and the like," but "standing . . . is perhaps the most important of these doctrines." *Id.*

To have standing, plaintiffs must establish (1) that they have suffered an injury in fact, (2) that their injury is fairly traceable to a defendant's conduct, and (3) that their injury would likely be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Each of these elements must be supported "with the manner and degree of evidence required at the successive stages of the

---

[2] In its answering brief, the Secretary asserts that the district court properly resolved any necessary factual disputes and that it was "Plaintiffs' burden below 'to furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction.'" This misstates the law. To the extent the district court purported to resolve factual disputes relating to subject matter jurisdiction on the basis of the preliminary injunction hearing, this would be error, particularly insofar as those evidentiary issues are intertwined with the merits.

litigation." *Id.* at 561. At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.*

The district court held that none of Plaintiffs has standing to mount a facial attack on the Ballot Order Statute. Plaintiffs do not appeal the district court's holding that the individual voters lack standing, arguing only that the organizational plaintiffs—that is, the DNC, the DSCC, and Priorities— have standing. In a suit with multiple plaintiffs, generally only one plaintiff need have standing for the suit to proceed. *See Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993). We find that the DNC has sufficiently established standing to proceed beyond the pleading stage. We do not address the standing of the other plaintiffs.

1.  *Injury in Fact*

To meet the first element of standing, a plaintiff's "injury in fact" must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Of particular relevance here is the requirement that the injury be "particularized," rather than a "generalized grievance." *Id.* at 560, 575. "The fact that a harm is widely shared does not necessarily render it a generalized grievance." *Sisley v. U.S. Drug Enf't Admin.*, 11 F.4th 1029, 1034 (9th Cir. 2021). "Rather, a grievance too 'generalized' for standing purposes is one characterized by its abstract and indefinite nature—for example, harm to the common concern for obedience to law." *Id.*

Plaintiffs argue that the DNC has satisfied injury in fact on the basis of its "competitive standing," explaining that the Ballot Order Statute "frustrat[es] its mission and efforts to elect Democratic Party candidates" by allegedly diverting

more votes to Republicans than Democrats, thereupon giving the Republican Party an unfair advantage.

We first recognized the doctrine of competitive standing in *Owen v. Mulligan*, 640 F.2d 1130 (9th Cir. 1981). In that case, a candidate and "Republic[an] Committee members" sued the U.S. Postal Service for giving an opponent a cheaper mailing rate, in violation of its own regulations and a previous injunction. *Id.* at 1132–33. The Postal Service argued that the "potential loss of an election" was "too remote, speculative, and unredressable to confer standing." *Id.* at 1132. Rejecting that argument, we recognized both the candidate's and the party officials' standing to sue "to prevent their opponent from gaining an unfair advantage in the election process through abuses of mail preferences which arguably promote his electoral prospects." *Id.* at 1133.

We next addressed competitive standing in *Drake v. Obama*, 664 F.3d 774, 778 (9th Cir. 2011), a case involving a challenge to President Obama's eligibility to serve as President brought by a group of plaintiffs that included Presidential candidates. There, we reaffirmed *Owen*'s holding that, as relevant to this case, the "potential loss of an election [is] an injury-in-fact sufficient to give . . . party officials standing" to challenge an offending election regulation. *Id.* at 783. Ultimately, we held that the candidate-plaintiffs lacked standing because, by the time they had filed their suit, the election had already passed and they were thus no longer candidates. *Id.* at 783–84. However, we distinguished the facts of that case from one in which a plaintiff—like Plaintiffs here—challenged "an ongoing practice that would have produced an unfair advantage in the next election." *Id.* at 783 n.3.

Citing *Owen* and *Drake*, Plaintiffs argue that, like the party committee members in *Owen*, the DNC, as the

operational arm of the Democratic Party, *see* 52 U.S.C. § 30101(14), has standing to sue based on the ongoing, unfair advantage conferred to their rival candidates by the Ballot Order Statute. We agree. If an allegedly unlawful election regulation makes the competitive landscape worse for a candidate or that candidate's party than it would otherwise be if the regulation were declared unlawful, those injured parties have the requisite concrete, non-generalized harm to confer standing.[3]

This principle is neither novel nor unique to the realm of the electoral. Competitive standing recognizes the injury that results from being forced to participate in an "illegally structure[d] competitive environment," *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 87 (D.C. Cir. 2005), a type of harm that we have identified in a variety of different contexts, *see, e.g.*, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019) ("[The] inability to compete on an even playing field constitutes a concrete and particularized injury."); *Preston v. Heckler*, 734 F.2d 1359, 1365 (9th Cir. 1984) ("[W]hen challenged agency conduct allegedly renders a person unable to fairly compete for some benefit, that person has suffered a sufficient 'injury in fact' and has standing . . . ."). Accordingly, a number of our sister Circuits have come to the same conclusion as we do here in similar cases involving ballot order statutes. *See Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907 (8th Cir. 2020) (per curiam) (political committees, including the

---

[3] That both a candidate and a candidate's political party can assert standing based on their shared interest in "fair competition," *see Drake*, 664 F.3d at 782, follows not only from our decision in *Owen*, which held as much, *see* 640 F.2d at 1132, but also from the fact that typically, and as Plaintiffs alleged here, "after the primary election, a candidate steps into the shoes of his party, and their interests are identical," *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 588 (5th Cir. 2006).

DSCC, had standing to challenge Minnesota's ballot order statute "insofar as it unequally favors supporters of other political parties"); *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014) (political parties had standing to challenge ballot order statute because they were "subject to the ballot-ordering rule" and supported candidates "affected by" the law); *see also Nelson v. Warner*, 12 F.4th 376, 384 (4th Cir. 2021) (candidate had standing to challenge ballot order statute that "allegedly injure[d] his chances of being elected").

Contrary to these established principles, the district court rejected the DNC's competitive standing theory, relying principally on our decision in *Townley v. Miller*, 722 F.3d 1128 (9th Cir. 2013). In that case, the Nevada Republican Party, along with other plaintiffs, challenged a statute mandating the appearance of a "none of these candidates" ("NOTC") option on the ballot, which the Party alleged would cause its candidates to receive fewer votes and thus harm its chances in an election. *Id.* at 1135. "Assuming without deciding" that the Republican Party had satisfied "standing's injury-in-fact requirement" on the basis of its alleged competitive harm, we held that standing failed for the separate reason that the "causation/traceability and redressability requirements" were not met. *Id.* at 1135–36. The reason was simple: The Party did not challenge the appearance of the NOTC option on the ballot (which it conceded was legal) but only that votes for that option were given no legal effect. *Id.* at 1136. Because the alleged siphoning effect would give rise to injury regardless of whether the option was given legal effect or not, the challenged aspect of the statute was "immaterial to plaintiffs' alleged *competitive* injury." *Id.*

The district court characterized the *Townley* decision as "narrow[ing] the scope of competitive standing," stating that this Court "declined to find competitive standing" on the ground that the "inclusion of an 'NOTC' was not the [impermissible] *inclusion of a candidate* on the ballot." This was in error. Rather than narrowing competitive standing as a basis for injury in fact, *Townley* reasserted this Court's long-held position that the "potential loss of an election" may give rise to standing. 722 F.3d at 1135–36 (quoting *Drake*, 664 F.3d at 783–84).[4]

Further, because the injury is the burden of being forced to compete under the weight of a state-imposed disadvantage, we reject the Secretary's argument that "Plaintiffs must show"—or rather, allege, given the current procedural posture—"that the primacy effect has changed (or will imminently change) the actual outcome of a partisan election." The Secretary suggests that, absent the allegation of a changed outcome, "Plaintiffs' purported injury remains 'conjectural' or 'hypothetical,'" citing in support the Supreme Court's decision in *Gill v. Whitford*, 138 S. Ct. 1916 (2018). But *Gill* offers no support for that position. In that case, the Supreme Court held that, in order to establish standing to challenge an allegedly unconstitutional gerrymander on the basis of a voter-dilution theory, a voter-plaintiff must show that he or she resides in a gerrymandered district, explaining that absent such a showing the voter lacks a sufficiently "particularized" injury. *Id.* at 1926, 1934. It

---

[4] In any case, *Townley* could not have narrowed the doctrine adopted in *Owen* (and reaffirmed in *Drake*) because it was the decision of a three-judge panel. *See Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court.").

thus left undisturbed the distinct and established competitive standing doctrine. *See id.* at 1937–38 (Kagan, J., concurring) ("Everything said so far relates only to suits alleging that a partisan gerrymander dilutes individual votes. That is the way the Court sees this litigation.").

We thus conclude that the DNC has sufficiently pled an injury in fact.

### 2. *Traceability and Redressability*

The Secretary also argues that even if Plaintiffs could demonstrate an injury in fact, they cannot meet the two elements of standing not addressed by the district court—traceability and redressability. *See Lujan*, 504 U.S. at 560–61. "[T]he 'fairly traceable' and 'redressability' components for standing overlap and are 'two facets of a single causation requirement.'" *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013) (quoting *Allen*, 468 U.S. at 753 n.19). However, they are distinct in that traceability "examines the connection between the alleged misconduct and injury, whereas redressability analyzes the connection between the alleged injury and requested relief." *Id.*

To establish traceability, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. The Secretary argues that Plaintiffs cannot establish traceability because neither the challenged section of the Ballot Order Statute, A.R.S. § 16-502(E), nor the provision that directs the board of supervisors in Arizona's counties to prepare and print ballots, A.R.S. § 16-503, mentions the Secretary. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253–54 (11th Cir. 2020) (plaintiff failed to

plead an injury traceable to the Florida Secretary of State where the challenged ballot order statute "tasks the Supervisors, independently of the Secretary, with printing the names of candidates on ballots in the order prescribed by the ballot statute"). Similarly, the Secretary argues that Plaintiffs' claims and relief sought fail for lack of redressability because "[a]n injunction ordering the Secretary not to follow the ballot statute's instructions for ordering candidates cannot provide redress, for neither she nor her agents control the order in which candidates appear on the ballot." *Id.* at 1254.

However, while the county supervisors print the ballots under A.R.S. § 16-503, they have no discretion in ordering candidate names. Rather they are bound to follow the Statute and the Election Procedures Manual, which is promulgated by the Secretary as a matter of Arizona law. *See* A.R.S. § 16-452(C) ("A person who violates any rule adopted [by the Secretary in the Manual] is guilty of a class 2 misdemeanor."). The Manual, which contains detailed instruction on ballot design and expressly requires counties to order candidates' names on ballots in accordance with the Statute, is promulgated by the Secretary in the context of her role as Arizona's "chief state election officer," A.R.S. § 16-142(A)(1), who is tasked with "prescrib[ing] rules to achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating and storing ballots," A.R.S. § 16-452(A).[5] Indeed, relying on the Secretary's role in

---

[5] Because the Secretary has a role in overseeing the ballots, in contrast to the Florida Secretary of State, who "is responsible only for certifying" the nominees, the Eleventh Circuit's *Jacobson* decision is inapposite. 974 F.3d at 1253.

"promulgat[ing] rules . . . applicable to and mandatory for the statewide . . . elections," we have previously held that a challenged Arizona election law was traceable to the Secretary. *Arizona Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1281 (9th Cir. 2003). The same holds true here.

Redressability is satisfied so long as the requested remedy "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012). Because, as noted above, the Secretary is statutorily delegated the authority to "prescribe rules" for "producing [and] distributing" ballots in accordance with the Statute, A.R.S. § 16-452(A), the counties would have no choice but to follow a mandate from her directing them to order the ballots pursuant to a court's injunction. The Secretary does not dispute this point. Instead, she argues that her ability to adhere to a court's injunction may be stymied by the governor or the attorney general, both of whom must approve the Manual before it can go into effect. *See id.* § 16-452(B). But this is of no moment. "Plaintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision." *Renee*, 686 F.3d at 1013. Having shown that an injunction against the Secretary would "significant[ly] increase" the likelihood of relief, Plaintiffs have met their burden as to redressability. *Id*.

Thus, at least with regard to the DNC, Plaintiffs have satisfied all three elements of standing.

## B. *Political Question*

In addition to dismissing for lack of standing, the district court held that Plaintiffs' suit was nonjusticiable under the

political question doctrine. In general, a federal court "has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)). To this rule, the political question doctrine operates as only a "narrow exception." *Id.* Accordingly, the Supreme Court has limited its application to those few cases where there is either "a textually demonstrable constitutional commitment of the issue to a coordinate political department" or "a lack of judicially discoverable and manageable standards for resolving it." *Nixon v. United States*, 506 U.S. 224, 228, (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). As we have explained, "courts should undertake a discriminating case-by-case analysis to determine whether [a] question posed lies beyond judicial cognizance" under this doctrine. *Alperin v. Vatican Bank*, 410 F.3d 532, 545 (9th Cir. 2005).

In finding Plaintiffs' challenge to the Ballot Order Statute nonjusticiable for lack of manageable standards, the district court—adopting the Eleventh Circuit's reasoning in *Jacobson*, 974 F.3d at 1260–63—invoked the Supreme Court's recent decision in *Rucho v. Common Cause*, 139 S. Ct. 2484, 2491 (2019), a case involving challenges to two states' congressional districting maps as unconstitutional partisan gerrymanders. There, the Court concluded that, given its precedent allowing legislatures "to take partisan interests into account when drawing district lines," adjudicating just "how much" partisan gerrymandering "is too much" presents questions of "fairness" not suitable for judicial resolution. *Id.* at 2497, 2500–01. Relying on this language, the district court held that the present case was similarly nonjusticiable, characterizing Plaintiffs' complaint

as calling on the court to decide what constitutes a "fair" ballot ordering system.

But, in so holding, the district court overlooked the narrow scope of the *Rucho* decision, which the Supreme Court explicitly linked to its "struggle[] without success over the past several decades to discern judicially manageable standards for deciding" partisan gerrymandering claims. *Id.* at 2491. The Court explicitly distinguished partisan gerrymandering claims as "more difficult to adjudicate" than other election-related challenges, namely districting challenges grounded in "one-person, one-vote" violations and racial discrimination. *Id.* at 2497. As such, "[n]othing about the Court's language . . . suggests that the holding in *Rucho* is applicable outside the context of partisan gerrymandering claims." *Nelson*, 12 F.4th at 387.[6]

Indeed, adjudicating a challenge to a ballot order statute does not present the sort of intractable issues that arise in partisan gerrymandering cases. While cases like *Rucho* require "reallocating power and influence between political parties" through complicated exercises in (literal) line-

---

[6] Contrary to the suggestion of the district court, our decision in *Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020), did not extend *Rucho*'s reasoning to find claims related to climate change nonjusticiable under the political question doctrine. *See id.* at 1174 n.9 ("we do not find this to be a political question"). Rather, in that case, we found that the plaintiffs could not satisfy the redressability element of standing because the relief sought—"a comprehensive scheme to decrease fossil fuel emissions and combat climate change"—was inconsistent with the limited remedial authority of federal courts siting in equity. *Id.* at 1171–73; *see also Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 105 (1945) ("Equitable relief in a federal court is of course subject to restrictions," including that "the suit must be within the traditional scope of equity as historically evolved in the English Court of Chancery[.]"). That issue is not present here.

drawing, 139 S. Ct. at 2502, there is no comparable difficulty in constructing a ballot ordering scheme that lists candidates on a basis other than political party affiliation. Whether it be at random, through the sort of rotation system required in Arizona's primary election, *see* A.R.S. § 16-502(H), or by some other method, "[a]ny system that orders candidates on a basis other than party affiliation remedies the constitutional concern," *Jacobson*, 974 F.3d at 1301 (Pryor, Jill, J., dissenting). It is thus no surprise that, in contrast to the Court's persistent struggle to address partisan gerrymandering claims, federal courts—as well as state courts[7]—have adjudicated the merits of ballot order disputes for decades. *See Nelson*, 12 F.4th at 387 (collecting cases). Notably, this includes the U.S. Supreme Court, which, in a summary affirmance over an objection premised on the political question doctrine, upheld a district court's finding that an incumbent-favoring ballot order policy was a "purposeful and unlawful invasion of [the] plaintiffs' Fourteenth Amendment right to fair and evenhanded treatment." *Mann v. Powell*, 314 F. Supp. 677, 679 (N.D. Ill. 1969), *aff'd*, 398 U.S. 955 (1970).

More particularly, there is no reason to conclude that the Supreme Court's *Rucho* opinion "call[s] into question the use of the *Anderson*[-]*Burdick* framework," the constitutional test that "[c]ourts regularly [use to] evaluate and adjudicate disputes regarding the lawfulness of state

---

[7] For example, in *Kautenberger v. Jackson*, 85 Ariz. 128, 129 (1958), the Arizona Supreme Court considered a challenge under the state constitution to a law that required rotating candidates' names on paper ballots in primary elections but maintained a fixed ballot order on machine ballots. The court held that Arizona's constitution required name rotation due to the "well-known fact" that "where there are a number of candidates for the same office, the names appearing at the head of the list have a distinct advantage." *Id.* at 131.

[election] statutes, including ballot-order statutes." *Nelson*, 12 F.4th at 387; *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018) ("Our court has applied [the *Anderson-Burdick*] test to a wide variety of challenges to ballot regulations and other state-enacted election procedures."). Under the *Anderson-Burdick* test, a court identifies the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" and then weighs the injury "against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

As reflected in the Supreme Court's use of *Anderson-Burdick* to adjudicate claims that state election laws unconstitutionally burden political parties' rights, the test provides precisely the sort of judicially manageable standard that renders a case such as the instant one amenable to adjudication. *See, e.g.*, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357–64 (1997) (applying test to Minnesota law prohibiting candidates from appearing on ballot as candidate of more than one political party). Because the *Anderson-Burdick* test is available to review Plaintiffs' constitutional challenges, we conclude that we can "comfortably employ[] judicially manageable standards" in adjudicating the merits of the claims at issue here. *Pavek*, 967 F.3d at 907.

We therefore hold that the political question doctrine does not render the merits of this case nonjusticiable.[8]

---

[8] The district court further erred insofar as it based its finding of nonjusticiability on its determination that, as a factual matter, Plaintiffs

## C. *Eleventh Amendment*

The Secretary further argues that even if we disagree with both of the district court's jurisdictional holdings, we can nevertheless affirm the dismissal on the ground that Plaintiffs' suit is barred by Eleventh Amendment immunity. The Eleventh Amendment has been "construed to prohibit federal courts from entertaining suits brought by a state citizen against the state or its instrumentality in the absence of consent." *Culinary Workers Union, Loc. 226 v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999). However, under *Ex parte Young*, 209 U.S. 123 (1908), this immunity is subject to an exception for "actions for prospective declaratory or injunctive relief against state officers in their official capacities for their alleged violations of federal law" so long as the state officer has "some connection with enforcement of the act." *Coal. To Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *Ex parte Young*, 209 U.S. at 157).

The question of whether there is the requisite "connection" between the sued official and the challenged law implicates an analysis that is "closely related—indeed overlapping"—with the traceability and redressability inquiry already discussed. *Culinary Workers*, 200 F.3d at 619 (quoting *Okpalobi v. Foster*, 190 F.3d 337, 347 (5th Cir.1999)); *see also Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004) (noting that the two inquiries share a "common denominator"). Accordingly,

---

"did not meet their burden" of establishing "the existence of any ballot order effect in Arizona." Because the existence of such an effect is unquestionably an issue intertwined with the merits, the district court was not permitted to resolve this question of fact on a motion to dismiss. *See Augustine*, 704 F.2d at 1077.

the Secretary argues, as she did in connection to standing, that she lacks sufficient connection to the Ballot Order Statute because she is merely the chief state election officer, not the one who prints the ballots. In support of this position, the Secretary cites the Fifth Circuit's decision in *Mi Familia Vota v. Abbott*, 977 F.3d 461, 468–69 (5th Cir. 2020), in which the court held that a claim challenging a prohibition against the use of paper ballots did not fall within the *Ex parte Young* exception as applied to the Texas Secretary of State because county officials, and not the Secretary of State, were statutorily responsible for printing ballots.

The decision in *Mi Familia Vota*, however, was premised on a finding that an injunction against the Texas Secretary of State would still leave local officials with enough discretion to prevent meaningful relief, *see id.* at 467–68, whereas in Arizona, in contrast, the Secretary has clear duties to oversee ballot production, including, as already discussed, through the promulgation of the Manual, which the county officials have no discretion to disregard, A.R.S. §§ 16-452(A), (C). The "connection" required under *Ex parte Young* demands merely that the implicated state official have a relevant role that goes beyond "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision." *Planned Parenthood*, 376 F.3d at 919. Here, given the Secretary's role in promulgating the Election Procedures Manual, that modest requirement is far exceeded. The Secretary is thus properly named as a defendant under *Ex parte Young.*

Having decided that Plaintiffs' suit against the Secretary presents a justiciable case or controversy, we now turn to the merits.

D. *The Merits*

The right to vote is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). As such, voting is accorded "the most fundamental significance under our constitutional structure." *Burdick*, 504 U.S. at 433. But, "[o]n the other hand, the Constitution assigns to the States the duty to regulate elections, and election laws 'invariably impose some burden upon individual voters.'" *Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1186 (9th Cir. 2021) (quoting *Burdick*, 504 U.S. at 433). Moreover, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id.* at 1186–87 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

To balance these competing concerns, the Supreme Court "devised [the *Anderson-Burdick* test as] a 'flexible standard' for assessing laws that regulate elections." *Id.* at 1187 (quoting *Burdick*, 504 U.S. at 434). "This is a sliding scale test, where the more severe the burden, the more compelling the state's interest must be." *Soltysik*, 910 F.3d at 444. "A law that imposes a 'severe' burden on voting rights must meet strict scrutiny." *Hobbs*, 18 F.4th at 1187 (quoting *Burdick*, 504 U.S. at 434). "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434).

In assessing Plaintiffs' challenge to the Ballot Order Statute, the first step, as already noted, is to consider "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the

plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. Here, Plaintiffs assert a cognizable injury resulting from the "primacy effect," which Plaintiffs allege is so substantial so as to give "Republican candidates . . . a significant, state-mandated advantage, up and down the slate of partisan races," violating the First and Fourteenth Amendments by diluting votes for candidates whose party the Statute disfavors and conferring an unfair political advantage on certain candidates solely because of their partisan affiliation. *See, e.g.*, *McLain v. Meier*, 637 F.2d 1159, 1165–67 (8th Cir. 1980) (incumbent-first statute "burden[ed] the fundamental right to vote possessed by supporters of the last-listed candidates" and violated equal protection); *Sangmeister v. Woodard*, 565 F.2d 460, 467 (7th Cir. 1977) (policy of awarding first position on the ballot to the incumbent party violated equal protection); *Mann*, 314 F. Supp. at 679 (favoring incumbents when breaking ballot order ties violated "Fourteenth Amendment right to fair and evenhanded treatment"), *aff'd*, 398 U.S. 955.

The Secretary urges us to deem "any burden" imposed by the Statute as "negligible" and thus justified by the state's interest in "establish[ing] a manageable ballot layout." But the magnitude of the asserted injury is a function of the "primacy effect," presenting factual questions that cannot be resolved on a motion to dismiss. *See Soltysik*, 910 F.3d at 449. For example, the complaint alleged that in the 2020 election cycle, more than "80% of Arizona's voters [would] be presented with ballots in which the names of Republican candidates [were] listed first for every single partisan race." And, as noted, the Arizona Supreme Court has characterized the "distinct advantage" arising from a candidate's name appearing at the head of a ballot as a "well-known fact." *Kautenberger*, 85 Ariz. at 131. Moreover, even if the burden imposed is, as the Secretary contends, "not severe," that is

not the end of our inquiry. *Soltysik*, 910 F.3d at 445. Even a ballot measure "not severe enough to warrant strict scrutiny" may well be "serious enough to require an assessment of whether alternative methods would advance the proffered governmental interests." *Id.* at 450. And given that Arizona's asserted interest in a manageable ballot could seemingly be effectuated through a nondiscriminatory ordering system, "judgment in the Secretary's favor is premature" at this juncture. *Id.*

Accordingly, we reverse the district court's order and judgment dismissing Plaintiffs' claims with prejudice and remand for further proceedings consistent with this Opinion.

**REVERSED AND REMANDED.**