Fossella v Adams (2024 NY Slip Op 00891)

Fossella v Adams

2024 NY Slip Op 00891

Decided on February 21, 2024

Appellate Division, Second Department

Wooten, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 21, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ANGELA G. IANNACCI, J.P.
PAUL WOOTEN
HELEN VOUTSINAS
LILLIAN WAN, JJ.

2022-05794
 (Index No. 85007/22)

[*1]Vito J. Fossella, et al., respondents,
v
Eric Adams, etc., et al., defendants-appellants, Hina Naveed, et al., defendants-intervenors-appellants, et al., defendant, et al. defendant-intervenor.

APPEAL by the defendants Eric Adams, as Mayor of the City of New York, and the City Council of the City of New York, and separate appeal by the defendants-intervenors Hina Naveed, Carlos Vargas Galindo, Abraham Paulos, Emili Prado, Eva Santos Veloz, Melissa John, Angel Salazar, and Jan Ezra Undag, in an action, inter alia, for declaratory and injunctive relief, from an order of the Supreme Court (Ralph J. Porzio, J.), dated June 27, 2022, and entered in Richmond County. The order (1) denied the motion of the defendants Eric Adams, as Mayor of the City of New York, and the City Council of the City of New York, for summary judgment dismissing the complaint insofar as asserted against them and, in effect, declaring that Local Law No. 11 (2022) of City of New York is lawful and valid, (2) denied the defendants-intervenors' motion, among other things, for summary judgment dismissing the complaint insofar as asserted against them and, in effect, declaring that Local Law No. 11 (2022) of City of New York is lawful and valid, and (3) granted the plaintiffs' motion for summary judgment declaring Local Law No. 11 (2022) of City of New York null and void on the grounds that it violates the New York State Constitution, the New York State Election Law, and the Municipal Home Rule Law, and permanently enjoining the implementation or enforcement of that law.

Sylvia O. Hinds-Radix, Corporation Counsel, New York, NY (Richard Dearing, Devin Slack, and Mackenzie Fillow of counsel), for defendants-appellants.
Latino Justice PRLDEF, New York, NY (Cesar Z. Ruiz, Ghita Schwarz, Fulvia Vargas-De Leon, Jackson Chin, and Lourdes Rosado of counsel), for defendants-intervenors-appellants.
O'Connell and Aronowitz, P.C., Albany, NY (Cornelius D. Murray and Michael Y. Hawrylchak of counsel), for respondents.
New York Civil Liberties Union Foundation, New York, NY (Veronica R. Salama, Perry Grossman, and Molly K. Biklen), amicus curiae pro se.
White & Case LLP, New York, NY (Tripp Odom of counsel), for amici curiae New York Immigration Coalition and United Neighborhood Houses.
Hogan Lovells US LLP, New York, NY (Peter Bautz and Elizabeth Femia of counsel), for amicus curiae Common Cause New York.
Muslim Advocates, Washington, D.C. (Reem Subei, pro hac vice, Christopher Godshall-Bennett, pro hac vice, and Stephanie Rose Correa of counsel), amicus curiae pro se and for amici curiae Muslim Bar Association of New York, Muslim Community Network, UndocuBlack Network, OneAmerica, Islamophobia Studies Center, Black Leadership and Action Coalition, Jetpac, and National Lawyers' Guild, Rochester Chapter.
Morrison & Foerster LLP, New York, NY (Jessica Kaufman, Eric D. Lawson, and Lily Westergaard of counsel), for amicus curiae Ron Hayduk.

WOOTEN, J.

OPINION & ORDER
This case concerns the validity of Local Law No. 11 (2022) of City of New York, which created a new class of voters eligible to vote in municipal elections consisting of individuals who are not United States citizens and who meet certain enumerated criteria. We determine that this local law was enacted in violation of the New York State Constitution and Municipal Home Rule Law, and thus, must be declared null and void.
I. BACKGROUND
On December 9, 2021, the City Council of the City of New York (hereinafter the City Council) voted to adopt a bill designated as Intro 1867-A, and entitled "A Local Law to amend the New York city charter, in relation to allowing lawful permanent residents in New York city to vote in municipal elections." The local law created a new class of voters called "municipal voters" who would be entitled to vote in municipal elections for the offices of mayor, public advocate, comptroller, borough president, and council member. The law defines a "municipal voter" as "a person who is not a United States citizen on the date of the election on which he or she is voting," and who meets the following criteria: (1) "is either a lawful permanent resident or authorized to work in the United States"; (2) "is a resident of New York [C]ity and will have been such a resident for 30 consecutive days or longer by the date of such election"; and (3) "meets all qualifications for registering or pre-registering to vote under the election law, except for possessing United States citizenship, and who has registered or pre-registered to vote with the board of elections in the city of New York under this chapter."
The bill was submitted to former Mayor Bill de Blasio, who declined to sign or veto the bill before leaving office at the end of 2021. Incoming Mayor Eric Adams (hereinafter the Mayor) then declined to sign or veto the bill within 30 days of its passage. Consequently, pursuant to section 37(b) of the New York City Charter, the bill was deemed adopted as Local Law No. 11 of 2022 of City of New York (hereinafter the Local Law). The Local Law was codified in the New York City Charter as the new Chapter 46-A, entitled "Voting by Lawful Permanent Residents and Persons Authorized to Work in the United States."
In January 2022, the plaintiffs commenced this action against the Mayor, the City Council, and another defendant, inter alia, for a judgment declaring that the Local Law is null and void on the grounds that it violates the New York State Constitution, the New York State Election Law, and the Municipal Home Rule Law, and permanently enjoining the implementation or enforcement of the Local Law. The plaintiffs consist of (1) certain individuals registered to vote in the City of New York—Vito J. Fossella, Joseph Borrelli, Nicole Malliotakis, Veralia Malliotakis, Andrew Lanza, Michael Reilly, Michael Tannousis, Inna Vernikov, David Carr, Joann Ariola, Vickie Paladino, Robert Holden, Gerard Kassar, Michael Petrov, Wafik Habib, and Phillip Yan Hing Wong (hereinafter collectively the voter plaintiffs); (2) certain individuals who held or had recently been elected to public office—Vito J. Fossella, Joseph Borrelli, Nicole Malliotakis, Andrew Lanza, Michael Reilly, Michael Tannousis, Inna Vernikov, David Carr, Joann Ariola, Vickie Paladino, and Robert Holden (hereinafter collectively the officeholder plaintiffs); and (3) certain individuals and entities representing the Republican Party—Nicholas Langworthy, Gerard Kassar, the New York Republican State Committee, and the Republican National Committee (hereinafter collectively the political party plaintiffs).
The complaint alleged, among other things, that the City has approximately 5,000,000 active registered voters, that approximately 1,000,000 adults who are not U.S. citizens reside in the City, of which approximately 800,000 would be eligible to vote under the Local Law, and that noncitizens could potentially make up 15% or more of the electorate in future elections due to the Local Law, which is greater than the margin of victory in many municipal elections. Thus, the [*2]complaint alleged that the Local Law will "dramatically increas[e] the pool of eligible voters," which "will dilute the votes of United States citizens," including the voter plaintiffs, and will "cause an abrupt and sizeable change to the makeup of the electorate, which will force the [ ]officeholder [p]laintiffs to change the way that they campaign for office," as well as require the political party plaintiffs to "adjust their strategies and how they allocate their resources to help elect Republicans in New York."
In the first cause of action, the complaint alleges that the Local Law violates the New York State Constitution, which provides that local government officers and legislative representatives must be elected by "the [P]eople" (NY Const, art IX, § 1[a], [b]), defined as "[p]ersons entitled to vote as provided in section one of article two of this constitution" (id. § 3[d][3]), consisting exclusively of "citizen[s]" who meet certain criteria (NY Const, art II, § 1). In the second cause of action, the complaint alleges that the Local Law violates, inter alia, New York State Election Law § 5-102(1), which provides that "[n]o person shall be qualified to register for and vote at any election unless he is a citizen of the United States." In the third cause of action, the complaint alleges that the Local Law violates Municipal Home Rule Law § 23(2)(e) because it was enacted without a public referendum.
Thereafter, certain noncitizen voters—Hina Naveed, Carlos Vargas Galindo, Abraham Paulos, Emili Prado, Eva Santos Veloz, Muhammad Shahidullah, Melissa John, Angel Salazar, and Jan Ezra Undag (hereinafter collectively the intervenors)—moved for leave to intervene as defendants in this action, and their motion was granted without opposition.
In May 2022, the Mayor and the City Council (hereinafter together the City defendants) moved for summary judgment dismissing the complaint insofar as asserted against them and, in effect, declaring that the Local Law is lawful and valid. In support of the motion, the City defendants argued, inter alia, that the Local Law did not violate the New York State Constitution as the reference to article II, section 1, in defining "people" (see NY Const, art IX, § 3[d][3]), "was not an attempt to restrict the voting rights of individual voters, but rather, to clarify and expand the constitutionally protected right granted to local governments to have local officers elected through direct democratic elections." The City defendants also contended that the Local Law did not violate New York State Election Law as Election Law § 1-102 provides that "[w]here a specific provision of law exists in any other law which is inconsistent with the provisions of this chapter, such provision shall apply unless a provision of this chapter specifies that such provision of this chapter shall apply notwithstanding any other provision of law" (emphasis added), and that Election Law § 5-102(1) did not specify that it shall apply "notwithstanding any other provisions of law." In addition, the City defendants asserted that the Local Law did not violate the Municipal Home Rule Law due to the lack of a referendum, since the Local Law did not "change[ ] the method of nominating, electing or removing an elective officer" (Municipal Home Rule Law § 23[2][e] [emphasis added]).
The intervenors separately moved pursuant to CPLR 3211(a) and for summary judgment dismissing the complaint insofar as asserted against them and, in effect, declaring that the Local Law is lawful and valid. In addition to seeking dismissal based on the grounds raised by the City defendants, the intervenors argued that the plaintiffs lacked standing to commence this action. With regard to the voter plaintiffs, the intervenors asserted that vote dilution is not a cognizable harm under New York State law, and that those plaintiffs "are not in any different position than they were prior to the enactment of the law." With regard to the officeholder plaintiffs and the political party plaintiffs, the intervenors contended that mere speculation that those plaintiffs will need to change campaign strategies is insufficient to confer standing.
Additionally, the plaintiffs moved for summary judgment declaring the Local Law null and void on the grounds that it violates the New York State Constitution, the New York State Election Law, and the Municipal Home Rule Law, and permanently enjoining the implementation or enforcement of the Local Law. In support of the motion, the plaintiffs argued, inter alia, that the voter plaintiffs had standing to challenge the Local Law on the basis of vote dilution. They also argued that those plaintiffs had standing to challenge the Local Law based upon the failure to conduct a referendum as required by the Municipal Home Rule Law, and that such injury fell within the "zone of interests" protected by the Municipal Home Rule Law, which was enacted to ensure that electors have a voice regarding any significant changes to local government. In addition, the plaintiffs asserted that the officeholder plaintiffs had standing to challenge the Local Law on the basis of electoral "disadvantage," and that the political party plaintiffs had standing based upon the [*3]need for the diversion of resources due to the Local Law. With regard to the merits, the plaintiffs maintained that the New York State Constitution and the Election Law expressly limited voting to United States citizens. The plaintiffs also contended that the Local Law violated the Municipal Home Rule Law, since the Local Law "changed the method by which all municipal elective officers are elected by effectively replacing the existing electorate with a differently constituted population."
In an order dated June 27, 2022, the Supreme Court denied the separate motions of the City defendants and the intervenors, and granted the plaintiffs' motion. The court determined that the voter plaintiffs had standing to challenge the Local Law based upon vote dilution, and that the officeholder plaintiffs and political party plaintiffs had standing based upon the impact of the Local Law on campaigning. With regard to the merits, the court determined that the Local Law violated the New York State Constitution, the New York State Election Law, and the Municipal Home Rule Law. The City defendants appeal, and the intervenors separately appeal, from the order [FN1]. II. ANALYSIS
A. Standing
At the outset, since the intervenors-appellants contend that the Supreme Court erred in determining that the plaintiffs had standing to bring this action, we first evaluate that issue.
Standing requires "an interest in the claim at issue in the lawsuit that the law will recognize as a sufficient predicate for determining the issue at the litigant's request" (Caprer v Nussbaum, 36 AD3d 176, 182; see Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 772-773). To establish standing, the plaintiff must demonstrate "both an injury-in-fact and that the asserted injury is within the zone of interests sought to be protected by the statute alleged to have been violated" (Matter of CPD NY Energy Corp. v Town of Poughkeepsie Planning Bd., 139 AD3d 942, 943 [internal quotation marks omitted]; see New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d 207, 211). "To demonstrate an 'injury in fact,' a plaintiff must 'establish that he or she will actually be harmed by the challenged action, and that the injury is more than conjectural'" (Matter of American Massage Therapy Assn. v Town of Greenburgh, 173 AD3d 1009, 1010, quoting Caprer v Nussbaum, 36 AD3d at 182).
Where a defendant seeks dismissal pursuant to CPLR 3211(a)(3) based on lack of standing, "'the burden is on the moving defendant to establish, prima facie, the plaintiff's lack of standing'" (Golden Jubilee Realty, LLC v Castro, 196 AD3d 680, 682, quoting BAC Home Loans Servicing, LP v Rychik, 161 AD3d 924, 925). "'To defeat a defendant's motion, the plaintiff has no burden of establishing its standing as a matter of law; rather, the motion will be defeated if the plaintiff's submissions raise a question of fact as to its standing'" (Golden Jubilee Realty, LLC v Castro, 196 AD3d at 682, quoting Deutsche Bank Trust Co. Ams. v Vitellas, 131 AD3d 52, 60). Similarly, where a defendant moves for summary judgment dismissing the complaint on the ground of lack of standing, "the burden is on the moving defendant to establish, prima facie, the plaintiff's lack of standing, rather than on the plaintiff to affirmatively establish its standing" (U.S. Bank N.A. v Pickering-Robinson, 197 AD3d 757, 763 [internal quotation marks omitted]). However, "'[w]here, as here, the plaintiff's standing has been placed in issue by a defendant's answer, the plaintiff must prove its standing as part of its prima facie showing on a motion for summary judgment'" on the complaint (Wells Fargo Bank, N.A. v Carrington, 221 AD3d 746, 748, quoting Deutsche Bank Natl. Trust Co. v Gulati, 188 AD3d 999, 1000).
Further, in an action involving multiple plaintiffs, a court may address the merits of a particular cause of action providing "at least one" of the plaintiffs has standing to pursue it (Empire State Ch. of Associated Bldrs. & Contrs., Inc. v Smith, 21 NY3d 309, 315; see Town of Chester v Laroe Estates, Inc., 581 US 433, 439).
For reasons discussed hereinafter, we determine that the voter plaintiffs lacked standing to assert the first and second causes of action, challenging the Local Law as violative of the New York State Constitution and the New York State Election Law, respectively, but that those plaintiffs had standing to assert the third cause of action, challenging the Local Law due to the failure to conduct a referendum as required under the Municipal Home Rule Law. We also determine that the political party plaintiffs lacked standing to challenge the Local Law in this action. Nevertheless, we determine that the officeholder plaintiffs had standing to assert the first and second causes of action, albeit for a different reason than that stated by the Supreme Court. Thus, it is appropriate for [*4]this Court to evaluate each of the causes of action on the merits (see Empire State Ch. of Associated Bldrs. & Contrs., Inc. v Smith, 21 NY3d at 315).
1. Voter Plaintiffs
Initially, contrary to the plaintiffs' contention, we determine that the voter plaintiffs lacked standing to assert the first and second causes of action based upon their claims of vote dilution.
Under certain circumstances, vote dilution may be a sufficient basis for standing (see Gill v Whitford, _____ US _____, _____, 138 S Ct 1916, 1930; Saratoga County Chamber of Commerce v Pataki, 275 AD2d 145, 156; Wood v Raffensperger, 981 F3d 1307, 1314 [11th Cir]). Generally, allegations of vote dilution arise in the context of cases involving claims of partisan or racial gerrymandering—respectively, a drawing of district lines on the basis of political affiliation or race so as to cause certain votes to carry less weight (see Rucho v Common Cause, _____ US _____, _____, 139 S Ct 2484, 2513-2514 [Kagan, J., dissenting]; Abbott v Perez, _____ US_____, 138 S Ct 2305, 2314; Gill v Whitford, _____ US at _____, 138 S Ct at 1930). The practice of gerrymandering implicates the Fourteenth Amendment's Equal Protection Clause, which "guarantees the opportunity for equal participation by all voters," which "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise" (Reynolds v Sims, 377 US 533, 555, 566; see Abbott v Perez, _____ US at _____, 138 S Ct at 2314). Thus, a plaintiff voter has standing to sue where he or she alleges facts showing a disadvantage to his or her right to vote based upon vote dilution due to gerrymandering (see Gill v Whitford, _____ US at _____, _____, 138 S Ct at 1929-1930).
Whether arising in the context of a gerrymandering case or otherwise, a claim of vote dilution requires a "point of comparison" between the plaintiff voters and other voters who are differently situated (Wood v Raffensperger, 981 F3d at 1314; see Hudson v Haaland, 843 Fed Appx 336, 338 [DC Cir]). The harm of vote dilution "arises when an election practice . . . devalues one citizen's vote as compared to others" (Gill v Whitford, _____ US at _____, 138 S Ct at 1935 [Kagan, J., concurring] [emphasis added]), thereby "placing them in a position of constitutionally unjustifiable inequality vis-a-vis [differently situated] voters" (Baker v Carr, 369 US 186, 207 [emphasis added]). Where, however, a claim of vote dilution is "'common to all'" voters (Hudson v Haaland, 843 Fed Appx at 339, quoting Carney v Adams, 592 US 53, 59, 141 S Ct 493, 499), affecting all voters equally without an advantage to any group of voters, the claim constitutes a "paradigmatic generalized grievance that cannot support standing" (Wood v Raffensperger, 981 F3d at 1314).
Here, the voter plaintiffs alleged that they had standing because the Local Law would "dramatically increas[e] the pool of eligible voters," thereby diluting their votes as United States citizens. Notably, however, the voter plaintiffs raised no claim that they were treated any differently than noncitizens or that their votes would carry less weight as compared to the votes of noncitizens (see Wood v Raffensperger, 981 F3d at 1314; Nolles v State Comm. for the Reorgnization of Sch. Dists., 524 F3d 892, 900 [8th Cir]). In cases involving gerrymandering, district lines are drawn to disadvantage certain voters by dividing those voters among multiple districts so they fall short of a majority in each district and/or "packing" them into a highly concentrated district to prevent them from winning other districts (see Rucho v Common Cause, _____ US at _____, 139 S Ct at 2492). Here, however, there is no allegation that the votes of United States citizens would be distributed in a wasteful manner relative to the votes of noncitizens. Rather, the Local Law simply increases the eligible voting pool, which affects all voters equally.
Moreover, the voter plaintiffs' allegation that their votes would be diluted because more people would be eligible to vote in municipal elections was "neither sufficiently concrete nor particularized to establish a cognizable injury" (Kalson v United States, 159 Fed Appx 326, 327 [2d Cir]; see Tafuto v Donald J. Trump for President Inc., 827 Fed Appx 112, 114-115 [2d Cir]; cf. Department of Commerce v United States House of Representatives, 525 US 316, 332). Indeed, the voter plaintiffs did not explain how the alleged vote dilution affected them differently than every other member of the public (see Bargo v United States, 715 Fed Appx 17, 17-18 [DC Cir]).
Consequently, the intervenors established, prima facie, that the voter plaintiffs lacked standing to challenge the Local Law on the ground of vote dilution, and those plaintiffs failed to raise a question of fact as to their standing on that basis.
However, as the intervenors-appellants correctly conceded at oral argument before this Court on June 23, 2023, the voter plaintiffs had standing to challenge the Local Law based upon [*5]the enactment of the Local Law without a referendum as required under the Municipal Home Rule Law (see Matter of Schulz v State of New York, 81 NY2d 336, 347). The voter plaintiffs' injury—the deprivation of their right to vote on the Local Law in a referendum—falls within the "zone of interests" of Municipal Home Rule Law § 23, as the purpose of the referendum requirement under that provision is "to ensure that electors have a voice when substantial changes are proposed" (Matter of Gizzo v Town of Mamaroneck, 36 AD3d 162, 168). Thus, the plaintiffs established, prima facie, that the voter plaintiffs had standing to assert the third cause of action, challenging the Local Law based upon the lack of a referendum, and in opposition, the defendants failed to raise a triable issue of fact.
2. Political Party Plaintiffs
As the Supreme Court noted, political parties may possess standing to challenge a law that affects their "ability to associate and campaign for political office" (Green Party of Tennessee v Hargett, 767 F3d 533, 544 [6th Cir]), or may possess standing based upon injuries to members of the political party (see Jacobson v Florida Secretary of State, 974 F3d 1236, 1248-1249 [11th Cir]). Further, the chairs of political parties may have standing to sue as representatives of the parties (see Schulz v Williams, 44 F3d 48, 52-53 [2d Cir]).
Here, to the extent the political party plaintiffs alleged standing based upon vote dilution of the individual party members, those plaintiffs' allegations were neither sufficiently concrete nor particularized to establish a cognizable injury (see Donald J. Trump for President, Inc. v Way, 2020 WL 6204477, *5, 2020 US Dist LEXIS 196911, *15-16 [D NJ, No. 20-10753 (MAS) (ZNQ)]).
Furthermore, the political party plaintiffs' contention that the Local Law would require them "to adjust their strategies and how they allocate their resources to help elect Republicans in New York" was insufficient to serve as a basis for standing. "Although resource diversion is a concrete injury," the political party plaintiffs failed to indicate what expenses they would be required to divert resources away from in order to combat the alleged effects of the Local Law, or what, if any, activities might be impaired by the alleged need to change the allocation of resources (Jacobson v Florida Secretary of State, 974 F3d at 1250 [emphasis omitted]; cf. Common Cause/Georgia v Billups, 554 F3d 1340, 1350 [standing to challenge a law requiring voters to produce photo identification was premised on the diversion of resources from "getting voters to the polls" to assisting voters with obtaining adequate photo identification (alterations and internal quotation marks omitted)]). To the extent the political party plaintiffs will need to allocate additional resources to, among other things, create advertising targeted at noncitizen voters, those plaintiffs failed to explain how such additional expenses would be particularized to them, rather than to all political parties attempting to win the votes of noncitizen voters. Thus, the political party plaintiffs' allegations amounted to no more than a generalized interest in their preferred candidates getting as many votes as possible, which is not a sufficient basis for standing (see Jacobson v Florida Secretary of State, 974 F3d at 1250-1251).
Moreover, to the extent the political party plaintiffs alleged that the Local Law would materially affect the likelihood of Republican party candidates winning elections, that allegation was too conjectural to serve as a basis for standing (see Mecinas v Hobbs, 30 F4th 890, 897 [9th Cir]; Bruni v Hughs, 468 F Supp 3d 817, 825 [SD Tex]). The political party plaintiffs' reliance on Texas Democratic Party v Benkiser (459 F3d 582 [5th Cir]) is misplaced, as that case involved the decision to remove a candidate from the ballot as ineligible, which presented an imminent injury particularized to a political party.
Consequently, the intervenors established, prima facie, that the political party plaintiffs lacked standing to challenge the Local Law in this action, and those plaintiffs failed to raise a question of fact as to their standing.
3. Officeholder Plaintiffs
Contrary to the officeholder plaintiffs' contention, the intervenors established that their claim that the Local Law would require them to "change the way that they campaign for office and will materially affect their likelihood of future electoral victory" was an insufficient basis for standing. That alleged injury was too conjectural to establish standing, as it cannot be presumed that noncitizen voters will necessarily favor candidates other than the officeholder plaintiffs (see Matter of Brennan Ctr. for Justice at NYU Sch. of Law v New York State Bd. of Elections, 159 AD3d 1301, 1305, lv granted 32 NY3d 912). Moreover, the officeholder plaintiffs raised no allegations and presented no evidence as to the political affiliations of the noncitizen voters so as to raise an issue [*6]of fact as to standing on this basis.
Nevertheless, we determine that the officeholder plaintiffs have standing to challenge the Local Law on a different ground—that those plaintiffs have "a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates" (Carson v Simon, 978 F3d 1051, 1058 [footnote omitted] [8th Cir]; see Trump v Wisconsin Elections Commn., 983 F3d 919, 924 [7th Cir]; Albence v Higgin, 295 A3d 1065, 1087 [Del Sup Ct]). Assuming, arguendo, the Local Law is unconstitutional or otherwise unlawful, "candidate[s] who run[ ] the risk of defeat because of the casting of ballots that are the product of an extra-constitutional statute ha[ve] standing to challenge that statute" (Albence v Higgin, 295 A3d at 1087). Here, since the record reflects that each of the officeholder plaintiffs intended to seek reelection, they possess standing to challenge the Local Law on the ground that such law may result in those plaintiffs losing reelection due to the improper inclusion of votes from noncitizens.
Moreover, the provisions of the New York State Constitution and the New York State Election Law relied upon by the officeholder plaintiffs to challenge the Local Law expressly set forth who is eligible to vote in municipal elections. Therefore, the potential injury to the officeholder plaintiffs consisting of inaccurate vote tallies based upon the inclusion of ineligible votes falls within the zone of interests the relevant provisions of the New York State Constitution and the Election Law seek to protect, as opposed to being "marginally related to . . . the[ir] purposes" (Society of Plastics Indus. v County of Suffolk, 77 NY2d at 774).
While it is noted that the officeholder plaintiffs raise the risk of an inaccurate vote tally as a basis for standing for the first time on appeal, we determine that the issue is properly before this Court, as it presents an issue of law which appears on the face of the record and could not have been avoided if brought to the Court's attention at the proper juncture (see Bellevue Towers & Gardens, LLC v Atlantis Natl. Servs., Inc., 208 AD3d 1300, 1301; Matter of Fleischer v New York State Liq. Auth., 103 AD3d 581, 584).
Accordingly, we determine that the officeholder plaintiffs established, prima facie, that they have standing to challenge the Local Law as invalid on the basis of the New York State Constitution and the New York State Election Law, and in opposition, the defendants failed to raise a triable issue of fact.
However, we note that the officeholder plaintiffs lack standing to challenge the Local Law based on the lack of a referendum. As discussed heretofore, the purpose of the referendum requirement under Municipal Home Rule Law § 23 is "to ensure that electors have a voice when substantial changes are proposed" (Matter of Gizzo v Town of Mamaroneck, 36 AD3d at 168). Whereas the voter plaintiffs possess standing to challenge the Local Law based on the lack of a referendum, the officeholder plaintiffs did not allege an injury falling within the purpose of the referendum requirement under the Municipal Home Rule Law.
B. Validity of the Local Law
As discussed hereinafter, we determine that the Local Law violated the New York State Constitution and Municipal Home Rule Law, but not the New York State Election Law.
1. New York State Constitution
"The maxim expressio unius est exclusio alterius applies in the construction of the statutes, so that where a law expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded" (Colon v Martin, 35 NY3d 75, 78 [internal quotation marks omitted]; see Matter of Jose R., 83 NY2d 388, 394). "The same rules apply to the construction of a Constitution as to that of statute law" (Matter of Wendell v Lavin, 246 NY 115, 123; see Matter of Hoerger v Spota, 109 AD3d 564, 568, affd 21 NY3d 549). Further, "'[i]n the construction of constitutional provisions, the language used, if plain and precise, should be given its full effect' and '[i]t must be presumed that its framers understood the force of the language used and, as well, the people who adopted it'" (Matter of Harkenrider v Hochul, 38 NY3d 494, 511, quoting People v Rathbone, 145 NY 434, 438).
Pursuant to article II, section 1, of the New York State Constitution,
"Every citizen shall be entitled to vote at every election for all officers elected by the people . . . provided that such citizen is eighteen years of age or over and shall have been a resident of this state, and of the county, city, or village for thirty days next preceding an election" (emphasis added).
The plain language of this provision provides that the right to vote in "every election for all officers elected by the people" is available exclusively to "citizen[s]," as there is no reference to noncitizens, and thus, an irrefutable inference applies that noncitizens were intended to be excluded from those individuals entitled to vote in elections (see Colon v Martin, 35 NY3d at 78).
The City defendants and the intervenors-appellants argue that the term "citizen" in article II, section 1, represents "a floor, not a ceiling," as to who is entitled to vote in elections. However, this interpretation cannot be reconciled with article II, section 5, of the New York State Constitution which provides that "[l]aws shall be made for ascertaining, by proper proofs, the citizens who shall be entitled to the right of suffrage hereby established, and for the registration of voters" (emphasis added). Assuming, arguendo, noncitizens are not excluded from voting in elections by the New York State Constitution, the requirement in article II, section 5, for "citizens" to provide "proper proofs" of their entitlement to vote would not extend to noncitizen voters, which would be illogical (NY Const, art II, § 5).
Notwithstanding the foregoing, however, two questions remain as to whether the Local Law is barred by article II, section 1, of the New York State Constitution: (1) whether the reference to "citizen[s]" refers to United States citizens or New York State citizens; and (2) whether the phrase "every election for all officers elected by the people" refers solely to statewide elections or also includes municipal elections.
With regard to the first question, we determine that the reference to "citizen[s]" in article II, section 1, pertains to United States citizens (see People v Pease, 27 NY 45, 63; People ex rel. Juarbe v Board of Inspectors, 32 Misc 584, 585 [Sup Ct, NY County]). While the intervenors-appellants note that other provisions of the New York State Constitution use the phrase "citizen of the United States" (NY Const, art III, § 7; id. art IV, § 2 [emphasis added]), the State Constitution also contains a reference to "citizens of the state" in a separate provision (NY Const, art III, § 19 [emphasis added]). Thus, we decline to construe the phrase "citizen" in article II, section 1, as referring to a citizen of New York State based simply on the absence of the qualifying phrase "of the United States."
In an amicus curiae brief, the New York Civil Liberties Union Foundation (hereinafter the NYCLU) relies on the infamous decision in Dred Scott v Sandford (60 US 393) to argue that article II, section 1, should not be construed as referring to United States citizens. The NYCLU notes that the Dred Scott decision held that black men were not United States citizens, but that between the time that decision was issued in 1857 and the passage of the Fourteenth Amendment in 1868, black men were nevertheless permitted to vote in New York State. Therefore, the NYCLU posits that the reference to "citizen[s]" in article II, section 1, must have been in reference to New York State citizens. However, that New York State understood before the enactment of the Fourteenth Amendment that the Dred Scott decision was a blight that should not be followed does not reveal an intent to limit the term "citizen" in article II, section 1, to New York State citizens. The NYCLU also points out that a proposed amendment to article II, section 1, of the New York State Constitution to add the phrase "of the United States" after the word "citizen" was proposed and rejected at the 1867 constitutional convention. However, as the NYCLU notes, a reason offered by an opponent to the proposed amendment was that stating "citizen of the United States" in article II, section 1, might "defeat the exercise" of giving black men the right to vote in New York in light of the Dred Scott decision (Proceedings and Debates of the Constitutional Convention of the State of New York Held in 1867 and 1868, vol I at 518). Indeed, there is no indication that the decision not to adopt the amendment was based on an intent to deem the term "citizen" in article II, section 1, as referring only to New York State citizens, rather than due to concerns over disenfranchising black males.
Consequently, we perceive no basis to construe the reference to "citizen[s]" in article II, section 1, of the New York State Constitution as referring to New York State citizens.
With regard to the second question of interpretation, we determine that the plain language of article II, section 1, reflects that it applies to municipal elections, and is not limited to statewide elections. That provision states that it applies to "every election for all officers elected by the people," without the inclusion of any language limiting the provision to statewide elections (NY Const, art II, § 1 [emphasis added]). Applying the rules of statutory interpretation to the Constitution (see Matter of Wendell v Lavin, 246 NY at 123), courts should not "amend [the language] by inserting words that are not there" or "read into [the language] a provision which the [drafters] did not see fit to enact" (Matter of Chemical Specialties Mfrs. Assn. v Jorling, 85 NY2d 382, 394 [*7][internal quotation marks omitted]).
That the phrase "the people" employed in article II, section 1, of the New York State Constitution necessarily refers to "the people of the State of New York," does not reflect that the provision refers exclusively to statewide elections, as the voters in municipal elections consist of various subsets of "the people of the State of New York." It would not be inaccurate to describe the voters of a county, city, town, or village as members of "the people of the State of New York."
Moreover, article II, section 7, of the New York State Constitution states that "[a]ll elections by the citizens, except for such town officers as may by law be directed to be otherwise chosen, shall be by ballot, or by such other method as may be prescribed by law" (emphasis added). While it is true, as our dissenting colleague notes, that this provision simply confirms that secrecy in voting must be preserved without addressing eligibility to vote, the term "citizens" is used, which should be understood as referring to the same "citizen[s]" in section 1 of the same article addressing eligibility to vote. Notably, article II, section 7, contains an exception for municipal elections for "town officers," which suggests an intent to encompass elections in towns and other municipalities within the elections covered by article II of the State Constitution.
Our dissenting colleague notes that in Spitzer v Village of Fulton (172 NY 285), the Court of Appeals determined that article II of the New York State Constitution was not applicable to a vote on the financial affairs of a village. The Court stated that "[article II] was not intended to define the qualifications of voters upon questions relating to the financial interests or private affairs of the various cities or incorporated villages of the state, especially when, as in this case, it relates to borrowing money or contracting debts" (id. at 289). However, that case did not address the applicability of article II to municipal elections for elective officers such as mayor, public advocate, comptroller, borough president, and council member. Thus, Spitzer is of limited instructive value in this case.
Similarly, while the Supreme Court in Turco v Union Free School Dist. No. 4 (43 Misc 2d 367 [Sup Ct, Nassau County], affd 22 AD2d 1018) determined with respect to a proposition in a school district election that article II, section 1, of the New York State Constitution applies "only to general elections relating to governmental affairs of the whole State" (id. at 368), that decision, like Spitzer, did not involve the applicability of article II to municipal elections for elective officers.
While the determination in a concurring opinion in Matter of Blaikie v Power (13 NY2d 134) that article II, section 1, "is limited in its application to elections involving state officers or state issues" (id. at 144 [Burke, J., concurring] [internal quotation marks omitted]) is more closely applicable to the circumstances of this case, that statement was not issued in the majority decision and has not since been quoted or adopted by any other decision.
Further, in Johnson v City of New York (274 NY 411), which is also cited in the dissent, the Court of Appeals did not hold that article II, section 1, of the New York State Constitution was inapplicable to municipal elections. Rather, that decision held that article II, section 1, did not prohibit a system of "proportional representation" in which a voter is limited to voting for a single candidate for councilman (id. at 425). As explained by the majority decision in Matter of Blaikie v Power (13 NY2d 134), the decision in Johnson held that "the purpose of [article II, section 1] was solely to remove the disqualifications which attached to the person of the voter in earlier times and thereby assure to a citizen, qualified by age and residence, the same right to vote as every other similarly qualified voter possessed," and "not to regulate the mode of selection of elective officers" (id. at 140). Thus, the decisions in Johnson and Blaikie stand for the proposition that article II, section 1, imposes no restrictions on the manner of selecting elective officers, and do not aid the City defendants and the intervenors. Indeed, the decision in Johnson actually supports the plaintiffs' position, as that case addressed local borough elections for councilman, without making any determination that article II, section 1, is inapplicable to such elections because it only pertains to elections for statewide office.
Consequently, to the extent our dissenting colleague indicates that case law has held that article II, section 1, is inapplicable to municipal elections for elective office, we disagree. Rather, we determine based upon the plain language of article II, section 1, that it is not limited to statewide elections, and applies to "every election" for all officers to be elected by the people.
In any event, even assuming, arguendo, article II, section 1, is limited to statewide elections, the Local Law is in violation of article IX of the New York State Constitution. Pursuant to article IX, section 1(a), "[e]very local government, except a county wholly included within a city, shall have a legislative body elective by the people thereof" (emphasis added). "People" is defined [*8]under that same article as "[p]ersons entitled to vote as provided in section one of article two of this constitution" (id. § 3[d][3] [emphasis added]). Thus, article IX provides that the elected officials of "local governments" shall be elected by "the people," which incorporates by reference the eligibility requirements for voting under article II, section 1, applying exclusively to "citizens."
The City defendants and the intervenors-appellants argue that the definition of "people" provided under article IX, section 3(d)(3), is not limited to those persons entitled to vote as provided in article II, section 1, since the definition is preceded by language stating "the following terms shall mean or include" (NY Const, art IX, § 3[d] [emphasis added]). However, the Court of Appeals in Matter of United States Steel Corp. v Gerosa (7 NY2d 454) interpreted the same phrase at issue here, "shall mean or include," to evidence an intent to restrict application of the definition to the items listed, and to exclude any items which are not listed (see id. at 459). We disagree with our dissenting colleague that Gerosa is distinguishable on the ground that it involved the interpretation of a tax statute, whereas this case involves an interpretation of article IX of the New York State Constitution, which provides that "[r]ights, powers, privileges and immunities granted to local governments by this article shall be liberally construed" (NY Const, art IX, § 3[c] [emphasis added]). Although the powers delegated to municipalities under article IX shall be liberally construed, "'the lawmaking authority of a municipal corporation, which is a political subdivision of the State, can be exercised only to the extent it has been delegated by the State'" (Matter of Baldwin Union Free Sch. Dist. v County of Nassau, 105 AD3d 113, 117, affd 22 NY3d 606, quoting Albany Area Bldrs. Assn. v Town of Guilderland, 74 NY2d 372, 376), and "is only derived from express grant, never from a general grant of power" (Matter of Baldwin Union Free Sch. Dist. v County of Nassau, 105 AD3d at 117 [internal quotation marks omitted]). Thus, we decline to construe article IX as implicitly conferring on municipalities the power to afford noncitizens the right to vote absent any provision delegating such authority and since the only enumerated definition of "people" refers to citizens.
As a related matter, our dissenting colleague states that courts must construe the extent of a local government's powers under article IX of the New York State Constitution broadly "to the extent that such a construction is reasonably possible" (Albunio v City of New York, 16 NY3d 472, 477-478). However, the Court of Appeals' decision in Albunio—applying the "reasonably possible" standard—pertained to an interpretation of the New York City Human Rights Law, not the New York State Constitution, and there are no cases applying that standard to an interpretation of the State Constitution.
Moreover, we respectfully disagree with our dissenting colleague that there is any ambiguity in the definition of the term "people" under article IX, section 3(d)(3). To the contrary, we perceive no basis to read the sole definition listed of "people" as a nonexhaustive example of who may fall within the definition. Had the drafters intended not to limit "people" to "citizens," "people" could have been defined as residents of New York State who meet the criteria set forth in article II, section 1, other than citizenship.
In any event, even assuming, arguendo, there is any ambiguity, we disagree with our dissenting colleague that there is any legislative history reflecting an intent to confer upon municipalities the power to make noncitizens eligible to vote. Our dissenting colleague references prior amendments to the New York State Constitution's home rule provisions and the enactment of the Municipal Home Rule Law, which were motivated by a generalized desire to "expand and secure the powers enjoyed by local government" (Wambat Realty Corp. v State of New York, 41 NY2d 490, 496). However, our dissenting colleague's summary of legislative history does not identify any specific intent to expand voting rights to noncitizens or even to permit municipalities to decide the eligibility of voters in municipal elections independent from the eligibility requirements for statewide elections.
Consequently, in opposition to the plaintiffs' prima facie showing that the Local Law violates the New York State Constitution, the defendants failed to raise a triable issue of fact.
2. Election Law
Pursuant to Election Law § 5-102(1), "[n]o person shall be qualified to register for and vote at any election unless he is a citizen of the United States." This provision applies to "all elections at which voters of the state of New York may cast a ballot for the purpose of electing an individual to any party position or nominating or electing an individual to any federal, state, county, city, town or village office" (id. § 1-102). Thus, pursuant to the New York State Election Law, eligibility to vote in a municipal election is dependent upon United States citizenship.
Notwithstanding the foregoing, however, Election Law § 1-102 provides as follows: "Where a specific provision of law exists in any other law which is inconsistent with the provisions of this chapter, such provision shall apply unless a provision of this chapter specifies that such provision of this chapter shall apply notwithstanding any other provision of law" (emphasis added). Since Election Law § 5-102(1) does not state that such provision shall apply "notwithstanding any other provision of law," an inconsistency between that provision and "any other law" would not preclude the "other law" from being given effect (id. § 1-102). Thus, the issue of whether the Local Law is invalid due to an inconsistency with the New York State Election Law turns on whether the Local Law constitutes "any other law" within the meaning of Election Law § 1-102.
The plaintiffs argue that the phrase "any other law" should be read as limited to any other state law, without including a municipal law. We disagree. "When a statute is free from ambiguity, a court must construe it so as to give effect to its plain meaning" (Matter of Yong-Myun Rho v Ambach, 74 NY2d 318, 321-322). Where "a statute is clear, a court should not attempt to cure an omission in the statute by supplying what it believes should have been put there by the Legislature" (Prego v City of New York, 147 AD2d 165, 170). Here, we discern no ambiguity in the phrase "any other law" (Election Law § 1-102; see City of New York v New York City Bd. of Elections, 1991 WL 12018167, *1, 1991 NY Misc LEXIS 895, *5 [Sup Ct, NY County, No. 41450/91], affd 1991 NY App Div LEXIS 18134 [1st Dept]; Castine v Zurlo, 938 F Supp 2d 302, 313 [ND NY], affd in part, vacated in part on other grounds, remanded 756 F3d 171 [2d Cir]). Had the legislature intended to reference any other state law, "it easily could have so stated" by including the term "state" (Kuzmich v 50 Murray St. Acquisition LLC, 34 NY3d 84, 93). Thus, there is no basis for this Court to consider "other means of interpretation" (McKinney's Cons Laws of NY, Book 1, Statutes § 76).
We are not bound by the Supreme Court's decision in Castine v Zurlo (46 Misc 3d 995 [Sup Ct, Clinton County]), which is relied upon by the plaintiffs, and we decline to follow that decision. While that decision noted the concern that "if the language [of Election Law § 1-102] was interpreted to mean any other law whatsoever, municipalities would have the ability to rewrite all but 12 sections of the Election Law" (id. at 1001), it is ultimately the province of the legislature, not the courts, to address such concern (see Matter of Amorosi v South Colonie Ind. Cent. School Dist., 9 NY3d 367, 372).
Consequently, we disagree with the Supreme Court's determination that the Local Law was invalid based upon the New York State Election Law.
In light of our determination, we need not reach the parties' remaining contentions pertaining to the Election Law.
3. Municipal Home Rule Law
Through the referendum process, local laws that are subject to "mandatory referendum" under Municipal Home Rule Law § 23 must be "'submitted for the approval of the electors' at a general or special election and 'shall become operative as prescribed therein only if approved at such election by the affirmative vote of a majority of the qualified electors of such local government voting upon the proposition'" (Hoehmann v Town of Clarkstown, 40 NY3d 1, 6, quoting Municipal Home Rule Law § 23[1]). Thus, a law which is subject to a mandatory referendum "lacks operative effect until presented to and approved by the voters" (Hoehmann v Town of Clarkstown, 40 NY3d at 6; see Matter of McCabe v Voorhis, 243 NY 401, 410).
Pursuant to Municipal Home Rule Law § 23(2)(e), "[e]xcept as otherwise provided by or under authority of a state statute, a local law shall be subject to mandatory referendum if it," among other things, "changes the method of nominating, electing, or removing an elective officer" (emphasis added). Here, it is undisputed that a referendum was not conducted. Thus, the Local Law would not have operative effect if it is deemed to have changed the method of electing an elective officer.
The term "method" is not defined by the Municipal Home Rule Law, although we may consider dictionary definitions for guidance (see Hinton v Village of Pulaski, 33 NY3d 931, 937). "Method" has been defined as "[a] mode of organizing, operating, or performing something, esp[ecially] to achieve a goal" (Black's Law Dictionary [11th ed 2019], method). "Method" has also been defined as "a procedure or process for attaining an object," including "a way, technique, or process of or for doing something" (Merriam-Webster.com Dictionary, method [https//www.merriam-webster.com/dictionary/method]).
Here, we determine that the Local Law changed the method of electing an elective [*9]officer, as it created a new class of voters entitled to vote in municipal elections and changed the eligibility criteria for voting, thereby changing the election process. The City defendants argue that the method of election is the manner in which voters express their votes—"by secret ballot on which voters rank their choices in primaries and special elections and indicate their preferred winner or winners in general elections." However, the method of electing individuals to office is not limited to the casting of ballots in primaries and general elections, but rather encompasses a complex process including, among other things, the filing of designating petitions and objections thereto, and verification of the eligibility of candidates and voters. Since eligibility to vote is a prerequisite to casting a ballot in the first instance, it follows that eligibility criteria to vote falls within the election process or "method" of conducting an election.
The intervenors-appellants' reliance on Holbrook v Rockland County (260 AD2d 437) is misplaced. That case determined that a local law prohibiting elected officials from holding any other elected town or village office did not "curtail[ ]" the power of an elective officer so as to require a referendum under the Municipal Home Rule Law, without ever addressing the term "method" or considering a local law pertaining to the eligibility of voters (id. at 438 [internal quotation marks omitted]). Likewise, Matter of Golden v New York City Council (305 AD2d 598) is distinguishable as it involved issues of whether a local law amending term-limit provisions of a City Charter changed the length of term of office or curtailed the power of an officer (see id. at 599-600), which are of no relevance to this case.
Moreover, the Local Law at issue in this case would have significant implications beyond permitting noncitizens to vote. Section 1139 of the New York City Charter provides, by reference, that to be eligible to be elected to and hold the offices of mayor, public advocate, comptroller, borough president, and council member, a person must, among other things, satisfy the criteria for holding office enumerated in section 3 of the Public Officers Law, including being a citizen of the United States (see id. § 3[1]). However, as amended by the Local Law, section 1057-bb(a) of the New York City Charter provides that "eligible municipal voters shall have the right to vote in municipal elections and shall be entitled to the same rights and privileges as U.S. citizen voters with regard to municipal elections" (emphasis added). Since the "rights and privileges" of U.S. citizen voters with regard to municipal elections include the right to be elected to and hold the offices of mayor, public advocate, comptroller, borough president, and council member (presuming the other criteria for eligibility are satisfied), it necessarily follows that the Local Law would permit noncitizens to be eligible to be elected to and hold those offices. Thus, the Local Law would dramatically reshape the process of municipal elections by enabling noncitizens to hold elective office. In view of such far-reaching implications, the enactment of the Local Law without a referendum improperly obviates the fundamental right of the voters to participate in the electoral process (see Hoehmann v Town of Clarkstown, 40 NY3d at 6).
Consequently, in opposition to the plaintiffs' prima facie showing that the Local Law violates the Municipal Home Rule Law due to the lack of a referendum, the defendants failed to raise a triable issue of fact.
III. CONCLUSION
Contrary to the contentions of the City defendants and the intervenors-appellants, the Supreme Court properly granted those branches of the plaintiffs' motion which were for summary judgment declaring the Local Law null and void on the ground that it violates the New York State Constitution and the Municipal Home Rule Law, although the court erred in granting that branch of the plaintiffs' motion which was for summary judgment declaring the Local Law null and void on the ground that it violates the New York State Election Law, and in denying those branches of the motions of the City defendants and the intervenors which were for summary judgment dismissing the second cause of action insofar as asserted against them and, in effect, declaring that the Local Law does not violate the New York State Election Law.
Accordingly, the order is modified, on the law, by deleting the provision thereof denying that branch of the City defendants' motion which was for summary judgment dismissing the second cause of action insofar as asserted against them and, in effect, declaring that the Local Law does not violate the New York State Election Law, and substituting therefor a provision granting that branch of the motion, deleting the provision thereof denying that branch of the intervenors' motion which was for summary judgment dismissing the second cause of action insofar as asserted against them and, in effect, declaring that the Local Law does not violate the New York State Election Law, and substituting therefor a provision granting that branch of the motion, and [*10]deleting the provision thereof granting that branch of the plaintiffs' motion which was for summary judgment declaring the Local Law null and void on the ground that it violates the New York State Election Law, and substituting therefor a provision denying that branch of the motion; as so modified, the order is affirmed, and the matter is remitted to the Supreme Court, Richmond County, for the entry of a judgment, inter alia, declaring that the Local Law is null and void on the grounds that it violates the New York State Constitution and the Municipal Home Rule Law.
Since this is, in part, a declaratory judgment action, we remit the matter to the Supreme Court, Richmond County, for the entry of a judgment, inter alia, declaring that the Local Law is null and void on the grounds that it violates the New York State Constitution and the Municipal Home Rule Law (see Lanza v Wagner, 11 NY2d 317, 334).
IANNACCI, J.P., and VOUTSINAS, JJ., concur.
ORDERED that the order is modified, on the law, (1) by deleting the provision thereof denying that branch of the motion of the defendants Eric Adams, as Mayor of the City of New York, and the City Council of the City of New York which was for summary judgment dismissing the second cause of action insofar as asserted against them and, in effect, declaring that Local Law No. 11 (2022) of City of New York does not violate the New York State Election Law, and substituting therefor a provision granting that branch of the motion, (2) by deleting the provision thereof denying that branch of the motion of the defendants-intervenors which was for summary judgment dismissing the second cause of action insofar as asserted against them and, in effect, declaring that Local Law No. 11 (2022) of City of New York does not violate the New York State Election Law, and substituting therefor a provision granting that branch of the motion, and (3) by deleting the provision thereof granting that branch of the plaintiffs' motion which was for summary judgment declaring Local Law No. 11 (2022) of City of New York null and void on the ground that it violates the New York State Election Law, and substituting therefor a provision denying that branch of the motion; as so modified, the order is affirmed, with one bill of costs to the plaintiffs, payable by the defendants Eric Adams, as Mayor of the City of New York, and the City Council of the City of New York, and the defendants-intervenors Hina Naveed, Carlos Vargas Galindo, Abraham Paulos, Emili Prado, Eva Santos Veloz, Melissa John, Angel Salazar, and Jan Ezra Undag, appearing separately and filing separate briefs, and the matter is remitted to the Supreme Court, Richmond County, for the entry of a judgment, inter alia, declaring that Local Law No. 11 (2022) of City of New York is null and void on the grounds that it violates the New York State Constitution and the Municipal Home Rule Law.
WAN, J., concurs in part and dissents in part, and votes to reverse the order, on the law, grant the City defendants' motion for summary judgment dismissing the complaint insofar as asserted against them and, in effect, declaring that Local Law No. 11 (2022) of City of New York is lawful and valid, grant that branch of the motion of the defendants-intervenors which was for summary judgment dismissing the complaint insofar as asserted against them and, in effect, declaring that Local Law No. 11 (2022) of City of New York is lawful and valid, deny the plaintiffs' motion for summary judgment declaring Local Law No. 11 (2022) of City of New York null and void on the grounds that it violates the New York State Constitution, the New York State Election Law, and the Municipal Home Rule Law and permanently enjoining the implementation and enforcement of that law, and remit the matter to the Supreme Court, Richmond County, for the entry of a judgment, inter alia, declaring that Local Law No. 11 (2022) of City of New York is lawful and valid, with the following memorandum:
This action involves a dispute regarding the scope of a municipality's right of self-government and its powers to manage its own affairs in the context of a fundamental issue in any representative democracy: determining who may participate in the process of electing political leaders. By enacting Local Law No. 11 (hereinafter the noncitizen voting law), New York City's local government chose to confer a limited right to vote upon certain noncitizens who lawfully reside in the City. Pursuant to the noncitizen voting law, these individuals are able to participate in the local political process and have a say in deciding who will govern the communities in which they live. The majority affirms the Supreme Court's determination that the noncitizen voting law violates the New York State Constitution and the Municipal Home Rule Law. The majority, by deeming the noncitizen voting law invalid, effectively prohibits municipalities across the state from deciding for themselves the persons who are entitled to a voice in the local electoral process. The majority's determination also disenfranchises nearly one million residents of the City, despite the fact that its [*11]people's duly elected representatives have opted to enfranchise those same residents. There exists a well-established and "deeply felt belief" underpinning New York's home rule laws "that local problems should, so long as they do not impinge on affairs of the people of the State as a whole, be solved locally" (Matter of Resnick v County of Ulster, 44 NY2d 279, 288). The majority should therefore be reluctant to find that municipalities lack the authority to enact a law expanding the franchise. For the reasons that follow, I would reverse the court's order, grant the motion of the defendants Eric Adams, as Mayor of the City of New York, and the City Council of the City of New York (hereinafter the City Council and, together with Mayor Adams, the City defendants) for summary judgment dismissing the complaint insofar as asserted against them and, in effect, declaring that the noncitizen voting law is lawful and valid, grant that branch of the defendants-intervenors' motion which was for summary judgment dismissing the complaint insofar as asserted against them and, in effect, declaring that the noncitizen voting law is lawful and valid, deny the plaintiffs' motion for summary judgment declaring the noncitizen voting law null and void on the grounds that it violates the New York State Constitution, the New York State Election Law, and the Municipal Home Rule Law and permanently enjoining the implementation or enforcement of the noncitizen voting law, and remit the matter to the Supreme Court, Richmond County, for the entry of a judgment, inter alia, declaring that the noncitizen voting law is lawful and valid.
Throughout much of the early history of the United States, many state and local governments permitted immigrants who lacked citizenship to vote in certain elections, but the practice was eventually phased out (see Fletcher v Haas, 851 F Supp 2d 287, 295 n 13 [D Mass]; Jamin B. Raskin, Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage, 141 U Pa L Rev 1391, 1399-1417 [1993]). In recent years, however, some localities have revived the practice (see Cheryl I. Harris, Back to the Future: Recentering the Political Outsider, 118 Colum L Rev Online 153, 176 [2018]). On January 23, 2020, consistent with this revival, various members of the City Council and the Public Advocate for the City of New York introduced a bill to provide certain noncitizens with limited voting rights. Specifically, the bill sought to amend the New York City Charter to expand the franchise to lawful permanent residents and those legally authorized to work in the Unites States residing in the City, solely with regard to municipal elections. The law would permit nearly one million noncitizens to vote. While the proposed legislation permitted these noncitizens to vote for local offices—including mayor, comptroller, public advocate, city council member, and borough president—it expressly declined to allow them to vote for any state or federal office, consistent with state and federal law (see 18 USC § 611; Election Law § 5-102[1]). On December 9, 2021, a significant majority of the members of the City Council voted in favor of the bill. One month later, the bill became law (see New York City Charter § 37[b]), delineated as Local Law No. 11 of 2022, and codified as Chapter 46-a of the New York City Charter (see NY City Charter §§ 1057-aa through 1057-vv).
The very next day, the plaintiffs—a group of voters, officeholders and officeholders-elect, and individuals and entities affiliated with political parties—commenced this action against the City defendants and the Board of Elections in the City of New York (hereinafter the BOE). They sought, among other things, a judgment declaring that the noncitizen voting law was void in addition to a permanent injunction prohibiting the BOE from registering municipal voters and from counting votes cast by such voters. The plaintiffs asserted that the noncitizen voting law violated article II, section 1, and article IX, section 1, of the New York State Constitution, Election Law §§ 1-102 and 5-102(1), and Municipal Home Rule Law § 23(2)(e). Thereafter, a group of noncitizen residents eligible to vote under the noncitizen voting law moved for leave to intervene as defendants in this action (hereinafter the intervenors) and the Supreme Court granted their unopposed motion.
On May 9, 2022, the City defendants moved for summary judgment dismissing the complaint insofar as asserted against them and, in effect, declaring that the noncitizen voting law is lawful and valid. That same day, the intervenors filed a motion, inter alia, seeking similar relief. The plaintiffs also moved for summary judgment, seeking to have the noncitizen voting law declared null and void and to have the City defendants permanently enjoined from taking any steps to implement or enforce it.
By order dated June 27, 2022, the Supreme Court denied the separate motions of the City defendants and the intervenors and granted the plaintiffs' motion. The court, after rejecting the intervenors' contention that the plaintiffs lacked standing to challenge the noncitizen voting law, determined that article II, section 1, and article IX, section 1, of the New York State Constitution prohibited noncitizens from voting in any New York elections. The court reached the same [*12]conclusion with regard to Election Law §§ 1-102 and 5-102(1). Finally, the court held, among other things, that the noncitizen voting law was procedurally infirm since it was enacted without a mandatory referendum in violation of Municipal Home Rule Law § 23(2)(e). The City defendants appeal, as do the intervenors Hina Naveed, Carlos Vargas Galindo, Abraham Paulos, Emili Prado, Eva Santos Veloz, Melissa John, Angel Salazar, and Jan Ezra Undag (hereinafter collectively the defendants).
1. The Plaintiffs Possessed Standing to Assert Each of Their Three Causes of Action.
Initially, I concur with the majority that the Supreme Court properly considered the merits of the plaintiffs' causes of action, since at least one plaintiff had standing to assert each cause of action alleged in the complaint (see Empire State Ch. of Associated Bldrs. & Contrs., Inc. v Smith, 21 NY3d 309, 315). However, as discussed below, I disagree with the majority's determination on the merits that the noncitizen voting law violates the New York State Constitution and the Municipal Home Rule Law.
2. The Plaintiffs Failed to Demonstrate, Beyond a Reasonable Doubt, That the Noncitizen Voting Law Violated the New York State Constitution.
The plaintiffs have asserted a facial challenge to the constitutionality of the noncitizen voting law. "It is well settled that facial constitutional challenges are disfavored. Legislative enactments enjoy a strong presumption of constitutionality" (Matter of 1160 Mamaroneck Ave. Corp. v City of White Plains, 211 AD3d 723, 725 [internal quotation marks omitted]), whether enacted by the State Legislature or a local legislative body (see 41 Kew Gardens Rd. Assoc. v Tyburski, 70 NY2d 325, 333). "[P]arties challenging a duly enacted statute [therefore] face the initial burden of demonstrating the statute's invalidity beyond a reasonable doubt" (Matter of 1160 Mamaroneck Ave. Corp. v City of White Plains, 211 AD3d at 725 [internal quotation marks omitted]).
"'[T]he same rules apply to [analyzing] the construction of a Constitution as to that of [a] statute'" (Matter of Hoerger v Spota, 109 AD3d 564, 568, affd 21 NY3d 549, quoting Matter of Wendell v Lavin, 246 NY 115, 123). "A court's function in interpreting a statute [or constitutional provision] is to attempt to effectuate the intent of the Legislature, and where the . . . language [of the text] is clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used" (Forest Glen Realty, LLC v T11 Funding, 208 AD3d 1312, 1315 [internal quotation marks omitted]). "As the clearest indicator of legislative intent is the . . . text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (id. at 1316 [internal quotation marks omitted]). However, "[a]n examination of the legislative history is proper where the language is ambiguous or where a literal construction would lead to absurd or unreasonable consequences that are contrary to the purpose of the enactment" (Saul v Cahan, 153 AD3d 951, 952 [internal quotation marks omitted]). Moreover, "the courts are not free to legislate and[,] if any unsought consequences result, the Legislature is best suited to evaluate and resolve them" (Matter of Amorosi v South Colonie Ind. Cent. School Dist., 9 NY3d 367, 372 [internal quotation marks omitted]). Stated otherwise, "[c]ourts are not supposed to legislate under the guise of interpretation, and in the long run it is better to adhere closely to this principle and leave it to the Legislature to correct evils if any exist" (Bright Homes v Wright, 8 NY2d 157, 162). "Questions as to wisdom, need[,] or appropriateness are for the Legislature" (Matter of Spielvogel v Ford, 1 NY2d 558, 562).
Article II, section 1, of the New York State Constitution states, inter alia, that:
"[e]very citizen shall be entitled to vote at every election for all officers elected by the people . . . provided that such citizen is eighteen years of age or over and shall have been a resident of this state, and of the county, city, or village for thirty days next preceding an election."
Interpreting this provision, the Supreme Court concluded that, "by not expressly including non-citizens in the New York State Constitution, it was the intent of the framers for non-citizens to be omitted."
Although I agree with the majority that the word "citizen" in article II, section 1, means "United States citizen," that conclusion does not resolve the constitutionality of the noncitizen voting law, at least not standing alone. The purpose of article II, section 1, was "to define the general qualifications of voters for elective officers or upon questions which may be submitted to the vote of the people which affect the public affairs of the state" (Spitzer v Village of Fulton, 172 NY 285, 289; see Matter of Blaikie v Power, 13 NY2d 134, 141; Johnson v City of New York, 274 NY 411, [*13]419). But this provision "was not intended to define the qualifications of voters upon questions relating to the financial interests or private affairs of [municipalities]," since it "relates only to the general governmental affairs of the [whole] state" (Spitzer v Village of Fulton, 172 NY at 289-290; see Matter of Blaikie v Power, 13 NY2d at 141; Johnson v City of New York, 274 NY at 419). Indeed, contrary to the plaintiffs' contention, it has long been held that article II, section 1, of the New York State Constitution does not directly apply to elections for local offices (see Matter of Blaikie v Power, 13 NY2d at 144 [Burke, J., concurring] ["even if it were assumed that Article II, Section 1, does bar a system of limited voting, the system prescribed in the New York City Charter would not be affected because the constitutional provision is limited in its application to elections involving state officers or state issues"] [emphasis added and internal quotation marks omitted]; Johnson v City of New York, 274 NY at 420 [quoting Spitzer v Village of Fulton for the proposition that article II, section 1 "relates only to the general governmental affairs of the state," and "was intended merely to define the qualifications of voters for elective officers or upon questions which may be submitted to the vote of the people which affect the public affairs of the state" (internal quotation marks omitted)]; Spitzer v Village of Fulton, 172 NY at 287-289; Matter of Schulz v Horseheads Cent. School Dist. Bd. of Educ., 222 AD2d 819, 820; Matter of Carrick, 183 App Div 916, 916, affd on other grounds 223 NY 621; Croen v Vetrano, 52 Misc 2d 915, 915-916 [Sup Ct, Westchester County]; Turco v Union Free School Dist. No. 4, 43 Misc 2d 367, 368 [Sup Ct, Nassau County] ["It seems to me that Spitzer v Village of Fulton has authoritatively settled this question contrary to plaintiff['s] contention when it held that section [1] of article II applied only to general elections relating to governmental affairs of the whole State" (citation omitted)], affd 22 AD2d 1018; see also Temp St Commn on Rev and Simplification of the Constitution, First Steps Toward a Modern Constitution, 1959 NY Legis Doc No. 58 at 35-36 [recognizing the "status quo" that article II, section 1, "applies only to matters that relate to the general governmental affairs of the State, and not to local affairs of municipalities"]). Therefore, the phrase "the people" as used in the context of article II, section 1—that is, "[e]very citizen shall be entitled to vote at every election for all officers elected by the people and upon all questions submitted to the vote of the people" (NY Const, art II, § 1 [emphasis added])—refers to "the people of the State of New York," indicating that the section sets forth the qualifications for voters with regard to statewide matters.
In support of their contention that article II, section 1, of the New York State Constitution bars noncitizens from voting and that it directly applies to elections for local offices, the plaintiffs argue that other provisions of the State Constitution—specifically, article II, sections 5 and 7—support their interpretation. Beyond the fact that the Court of Appeals has already determined that article II, section 1, only applies to statewide elections (see e.g. Spitzer v Village of Fulton, 172 NY at 289), article II, section 5, merely directs the Legislature to enact laws for registering and ascertaining the identity of voters (see NY Const, art II, § 5). Contrary to the plaintiffs' contention, the fact that this provision exempts "town and village elections" from any registration requirement "except by express provision of law" (id.) does not raise an inference that article II, section 1, applies directly to local elections. This exemption relates to elections held in towns and villages, not to elections for town and village officers (see Charles Z. Lincoln, The Constitutional History of New York, vol III 1894-1905 91-108 [1905] [discussing legislative debates concerning opposition to imposing the registration requirement in rural areas]; NY Const of 1894, art II, § 4 [precursor provision stating, inter alia, that voters in villages below a certain population level were not required to register in-person]). Nor does article II, section 5, support the plaintiffs' contention that article II, section 1, prohibits noncitizens from voting in local elections. The fact that the provision refers to "citizens" is of no import because the relevant language—referring to "the citizens who shall be entitled to the right of suffrage hereby established" (NY Const, art II, § 5)—is plainly a reference to article II, section 1, which only applies to statewide elections (see e.g. Spitzer v Village of Fulton, 172 NY at 287-289). Moreover, article II, section 7, simply confirms that secrecy in voting must be preserved (see N.Y. Const, art II, § 7). The plaintiffs also fail to mention the contents of article II, section 3, which expressly outlines who is not permitted to vote (see id. § 3). This provision, which uses the term "person[s]" instead of "citizens," does not include noncitizens among the list of those unable to vote (id.), nor does any other provision of the State Constitution expressly exclude noncitizens from the franchise on statewide or local matters, or both.
It is worth noting that the majority, in its analysis of the constitutional question, has omitted any statement of the exacting standard at work here: that the plaintiffs must demonstrate the noncitizen voting law's invalidity "beyond a reasonable doubt" (Matter of 1160 Mamaroneck Ave. [*14]Corp. v City of White Plains, 211 AD3d at 725 [emphasis added]).
Since article II, section 1, does not directly apply to local elections, the defendants correctly contend that this Court must consider article IX of the New York State Constitution to determine whether the noncitizen voting law is constitutional. Article IX, entitled "Local Governments," guarantees certain "rights, powers, privileges[,] and immunities" to local governments (NY Const, art IX, § 1), which "shall be liberally construed" (id. § 3[c]). Among the other rights, powers, privileges, and immunities granted to them, "[e]very local government, except a county wholly included within a city, shall have a legislative body elective by the people thereof" (id. § 1[a] [emphasis added]), and "the people" shall also elect other local elected officers (id. § 1[b]). The term "people," as used throughout article IX, "shall mean or include . . . [p]ersons entitled to vote as provided in [article II, section 1]" (id. § 3[d][3] [emphasis added]). To the extent the term "include[s]" those entitled to vote in article II, section 1, the parties do not dispute that the term "people" would include but not necessarily be limited to such persons (see Bank of Am., N.A. v Kessler, 39 NY3d 317, 325 [defining the word "include" in this way], citing Red Hook Cold Stor. Co. v Department of Labor of State of N.Y., 295 NY 1, 8 [same]). However, the parties dispute whether "people" should be interpreted as "mean[ing]," i.e., referring solely to, those entitled to vote statewide in article II, section 1, or as "includ[ing]" such persons (NY Const, art IX, § 3[d][3]). The Supreme Court interpreted this provision—without explanation and without referencing the "mean or include" language—as "defin[ing]" the term "people" as used in article IX as those citizens entitled to vote in article II, section 1. In my view, this was error.
Since the definition of the term "people" as used in article IX, section 1, is inherently ambiguous because it either "means" those citizens entitled to vote in article II, section 1, or, alternatively, only "includes" such persons, it is appropriate to consider the relevant history in interpreting the term (see Saul v Cahan, 153 AD3d at 952). Article IX contains the New York State Constitution's home rule provisions. The history thereof supports the defendants' constitutional argument. "Municipal home rule in this State has been a matter of constitutional principle for [well over] a century" (Kamhi v Town of Yorktown, 74 NY2d 423, 428). The home rule provisions "were influenced by a long history of abuses by the [S]tate [L]egislature" (City of New York v Beretta U.S.A. Corp., 315 F Supp 2d 256, 271 [ED NY], citing W. Bernard Richland, Constitutional City Home Rule in New York, 54 Colum L Rev 311, 315-316 [1954]). "Beginning in the early nineteenth century, home rule sentiments were championed by public officials, judges[,] and others in response to the disproportionately low representation of New York City in New York State government" (City of New York v Beretta U.S.A. Corp., 315 F Supp 2d at 271). The "campaign for municipal . . . self-government . . . sought to vest control of local affairs in the hands of municipal authorities, free from extensive interference by state officials" (W. Bernard Richland, Home Rule and the New York Constitution, 66 Colum L Rev 1145, 1145 [1966]). "In 1963, the [L]egislature and New York voters amended the Constitution's home rule provisions" (Matter of Baldwin Union Free Sch. Dist. v County of Nassau, 22 NY3d 606, 614). That "same year, the Legislature enacted the [Municipal Home Rule Law]," a statutory scheme implementing the constitutional provisions (Hausser v Giunta, 88 NY2d 449, 452). The 1963 "amendment[s] w[ere] intended to expand and secure the powers enjoyed by local governments" (Wambat Realty Corp. v State of New York, 41 NY2d 490, 496; see Town of Black Brook v State of New York, 41 NY2d 486, 489). By implementing these amendments, the Legislature therefore sought to "grant[ ] increasingly greater autonomy to local governments[,] . . . evinc[ing] a recognition that essentially local problems should be dealt with locally" (Matter of Kelley v McGee, 57 NY2d 522, 535; see Matter of Resnick v County of Ulster, 44 NY2d at 288).
Therefore, while the general rule is that "the authority of a municipality to abrogate State law is never implied or inferred, but rather arises only from an express grant, never from a general grant of power by the State" (Matter of Baldwin Union Free Sch. Dist. v County of Nassau, 22 NY3d at 620 [alterations and internal quotation marks omitted]), the Court of Appeals has stated that "[p]erhaps the most significant delegation of state legislative authority is embodied in article IX of the Constitution, the home rule article" (id.). As such, "Article IX empower[s] municipalities to legislate in a wide range of matters relating to local concern, and generally, [s]o long as local legislation is not inconsistent with the State Constitution or any general law, localities may adopt local laws both with respect to their property, affairs or government, and with respect to other enumerate subjects, except to the extent that the legislature shall restrict the adoption of such a local law" (id. [internal quotation marks omitted]).
Among other provisions, "[t]he 1963 . . . [a]mendment[s] to the State Constitution . . . contain[ed] a declaration that [a]rticle IX is to be liberally construed" (Procaccino v Board of Elections of City of N.Y., 73 Misc 2d 462, 467 [Sup Ct, NY County]). Specifically, the "[r]ights, powers, privileges[,] and immunities granted to local governments by . . . article [IX] shall be liberally construed" as previously noted (NY Const, art IX, § 3[c]). This requirement applies, for example, when considering "the breadth of the power of [a] local government over its own property, affairs[,] or government" (Matter of Town of Islip v Cuomo, 64 NY2d 50, 56; see Matter of Baldwin Union Free Sch. Dist. v County of Nassau, 105 AD3d 113, 117, affd 22 NY3d 606). A court must therefore construe the extent of a local government's rights or powers "broadly in [its] favor . . . to the extent that such a construction is reasonably possible" (Albunio v City of New York, 16 NY3d 472, 477-478 [interpreting the New York City Human Rights Law]; see Carmin R. Putrino, Home Rule: A Fresh Start, 14 Buff L Rev 484, 493-494 [1965] ["Under the liberal construction clause, rights and powers will be construed in favor of the local unit [ ]," and therefore "doubtful powers should be allocated to the local governments"]).
Absent strong textual or historical evidence that the drafters of article IX intended for the term "people" to refer exclusively to those entitled to vote in article II, section 1, it is my view that a local government's judgment regarding the class of "people" entitled to vote in local elections is entitled to deference. The City's decision to exercise its article IX powers to expand the franchise in local elections to include noncitizens should therefore be afforded deference. The noncitizen voting law is inherently local because it permits qualified noncitizens to vote only in municipal elections, not federal or state elections (see NY City Charter §§ 1057-aa, 1057-bb, 1057-rr). Considering that the home rule provisions in article IX serve to provide local governments with "autonomy" based on the "recognition that essentially local problems should be dealt with locally" (Matter of Kelley v McGee, 57 NY2d at 535) and that "the powers delegated to local governments [therein] shall be liberally construed" in their favor (Matter of Baldwin Union Free Sch. Dist. v County of Nassau, 105 AD3d at 117), it is not inappropriate for the City to interpret the term "people" as used in article IX, sections 1(a) and (b), as including but not necessarily limited to those citizens entitled to vote in article II, section 1, of the New York State Constitution. The State Constitution states only that the term "[people] shall mean or include . . . [p]ersons entitled to vote as provided in [article II, section 1]" (NY Const, art IX, § 3[d][3]), without containing any clear indication—either in its text or in the relevant history—establishing that the term "mean[s]" as opposed to "include[s]" such persons.
While the plaintiffs urge this Court to interpret "people" as meaning, i.e., solely referring to, citizens qualified to vote statewide, it is my view that they have failed to meet their burden of establishing as much beyond a reasonable doubt (see Matter of 1160 Mamaroneck Ave. Corp. v City of White Plains, 211 AD3d at 725). Since the defendants have offered a construction of the relevant provisions of article IX that "is reasonably possible," this Court must adopt that construction because it favors the power of the City to manage its own affairs, even if the plaintiffs' interpretation is also reasonably possible (Albunio v City of New York, 16 NY3d at 478). To be clear, this does not mean that noncitizens possess a constitutional right to vote in New York, but only that the State Constitution does not prohibit municipalities from choosing to confer a limited right to vote in local elections upon persons beyond those expressly entitled to vote in article II, section 1.
Contrary to the plaintiffs' contention, the Court of Appeals' determination in Matter of United States Steel Corp. v Gerosa (7 NY2d 454) does not warrant a different conclusion. In that case, the Court was tasked with construing a state statute that set forth the class of persons and businesses subject to a tax and deciding whether the City improperly expanded the scope thereof to include entities not subject to the tax (see id. at 457-459). The Court of Appeals construed a statutory term defining a type of entity subject to the tax, which "mean[t] or include[d] a list of named special classes of business[es]," by concluding that the term was limited strictly to "the categories listed" (id. at 459 [internal quotation marks omitted]). In reaching its determination, the Court of Appeals made clear that it was relying upon the "expressio unius est exclusio alterius" maxim of statutory construction by citing a decision which applied that maxim (see id.; Colon v Martin, 35 NY3d 75, 78 [describing it as "an interpretive maxim that the inclusion of a particular thing in a statute implies an intent to exclude other things not included" (internal quotation marks omitted)]). In circumstances where a statutory term "includes" a list of examples, however, the maxim is inapplicable (see United States v Herrera, 974 F3d 1040, 1048 [9th Cir], citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 132 & n 1 [2012]; Bank [*15]of Am., N.A. v Kessler, 39 NY3d at 324). Therefore, in order to determine whether to apply the maxim to a statutory definition that begins with the phrase "mean or include," a court must first decide whether the circumstances indicate that the term means, or solely refers to, the listed examples, or whether it includes but is not necessarily limited to those items.
With this in mind, the circumstances presented in Gerosa, a dispute regarding the interpretation of a tax statute, plainly differ from those here. The New York State Legislature may delegate the power of taxation to municipalities, but "local governments can only levy and collect taxes within the expressed limitations of specific enabling legislation" (County of Nassau v Expedia, Inc., 189 AD3d 1346, 1348 [internal quotation marks omitted]). Not only is there no indication that the tax statute at issue in Gerosa contained a liberal construction clause, but "tax statutes should be strictly construed and limited to their terms" and "[a]ny ambiguity . . . should be resolved in favor of the taxpayer and against the taxing authority" (id. at 1349 [internal quotation marks omitted]). It is therefore no surprise that the Court of Appeals interpreted the statutory term at issue in Gerosa as limited solely to the listed items, despite the presence of "mean or include" language in the statutory definition. For the reasons previously outlined, including the history and purpose of the New York State Constitution's home rule provisions and the liberal construction requirement, a different conclusion is warranted here.
Therefore, in my view, the plaintiffs failed to establish that the noncitizen voting law was unconstitutional beyond a reasonable doubt (see Matter of 1160 Mamaroneck Ave. Corp. v City of
White Plains, 211 AD3d at 725).
3. The Plaintiffs Have Not Demonstrated That the Noncitizen Voting Law Violates the New York State Election Law.
I agree with my colleagues in the majority that the plaintiffs failed to demonstrate that the noncitizen voting law violates the New York State Election Law. Notably, the Appellate Division, First Department, the only appellate court to address this issue, has concluded that the phrase "any other law" in section 1-102 of the Election Law includes local laws (see City of New York v New York City Bd. of Elections, 1991 WL 12018167, *2, 1991 NY Misc LEXIS 895, *4-5 [Sup Ct, NY County, No. 41450/91], affd 1991 NY App Div LEXIS 18134 [1st Dept]). Moreover, a federal district court persuasively reached the same determination as the First Department regarding the interpretation of the phrase "any other law" in Election Law § 1-102 (see Castine v Zurlo, 938 F Supp 2d 302, 313 [ND NY 2013], affd in part, vacated in part on other grounds, remanded 756 F3d 171 [2d Cir 2014]), as did the New York State Attorney General's Office in an informal but persuasive opinion (see 1980 Atty Gen [Inf Ops] 109, 1980 WL 107210, *1).
Since the language of the text of Election Law § 1-102 is clear and does not lead to absurd results, this Court need not consider the legislative history (see People v Witherspoon, 211 AD3d 108, 115). Nonetheless, contrary to the plaintiffs' contention, the history is, at best, ambiguous as to whether the Legislature intended for the phrase "any other law" to refer only to state laws.
The Election Law was recodified in 1976 (see L 1976, ch 233) in order to "simplif[y] and clarif[y]" existing law (Assembly Memo in Support, Bill Jacket, L 1976, ch 233 at 208). The recodification bill "eliminate[d] obsolete and conflicting provisions" of existing law, while also including certain "[s]ubstantive changes[,] . . . primarily to administrative procedures in the electoral process" (id.). One group that supported the bill noted that it "truly [accomplished] a recodification, [without] making substantial or highly controversial changes in the [existing] law" (League of Women Voters Memo of Support, Bill Jacket, L 1976, ch 234 at 12). Although the bill was signed into law on June 1, 1976 (see Laws of NY, Bill Jacket, L 1976, ch 233 at 2), the Legislature intentionally included therein a "delayed effective date" of December 1, 1977, to give itself "ample opportunity . . . to make additional changes . . . before the recodification bec[ame] law" (Assembly Memo in Support, Bill Jacket, L 1976, ch 233 at 209). The original version of section 1-102 in the recodification stated, inter alia, that any "specific provision of . . . the education law which is inconsistent with" the Election Law would control over the Election Law, not that "any other law" would control (Laws of NY, Bill Jacket, L 1976, ch 233 at 11 [emphasis added]). As the City defendants correctly assert, Election Law § 1-102 was based on or inspired by multiple different sections of the existing Election Law, including former Election Law § 130 (see Laws of NY, Bill Jacket, L 1976, ch 233 at 198 [Derivation Tables]), which directed, among other things, that "Article 6 of the Election Law, dealing with designation and nomination of candidates, [would] not repeal nor affect the provisions of a statute, general or local, prescribing a particular method of making [*16]nominations of candidates for certain . . . city offices" (Bareham v City of Rochester, 221 App Div 36, 41 [internal quotation marks omitted], mod 246 NY 140). Election Law § 1-102 was also based in part on former Election Law § 190, which stated, inter alia, that the Election Law applied to "general election[s]; . . . special election[s] called by the governor; [and,] so far as practicable, any election at which official ballots [we]re used if other provisions for the conduct thereof [were] not made by law" (1971 Atty Gen [Inf Ops] 64, 1971 WL 216809, *1 [emphasis omitted]). Read together, former Election Law §§ 130 and 190 indicate that provisions of law relating to designation and nominating candidates could supersede the Election Law, as could provisions of any type beyond those relating to general elections and special elections called by the governor.
Before the recodification of the Election Law went into effect, the Legislature, during the same session, passed a second bill amending various provisions of the first bill, including by deleting the phrase "education law" from section 1-102 and replacing it with "any other law" (Castine v Zurlo, 46 Misc 3d 995, 1000 [Sup Ct, Clinton County 2014]; see Bill Jacket, L 1976, ch 234 at 4). While the legislative history contains no explanation for that specific change, the purpose of the second bill, among other things, was to "make [ ] many technical and typographical corrections in the recodification" before it went into effect, while also "mak[ing] several additional changes from existing law" (Memorandum in Support, Bill Jacket, L 1976, ch 234 at 4). This second bill was signed into law on the same date as the first bill, and both bills similarly went into effect on the same date (see Laws of NY, Bill Jacket, L 1976, ch 233 at 1, 2, 210; Bill Jacket, L 1976, ch 234 at 1, 9, 11), a fact conceded by the plaintiffs at oral argument before this Court.
As the City defendants persuasively contend, this history suggests that the reference to "education law" was likely a typographical error, especially in light of the fact that the version of the law containing this phrase never went into effect. The history, however, does not explain the reason for expanding this standard from the limited contexts set forth in former Election Law §§ 130 and 190 to the entire Election Law, as set forth in section 1-102, although it is at least possible that this may have been one of the "substantive changes" to existing law (Assembly Memo in Support, Bill Jacket, L 1976, ch 233 at 208). In any event, the fact that the pertinent portion of section 1-102 was based upon a section in the existing law that referenced "general or local [statutes]" (former Election Law § 130) provides further support for the conclusion that "any other law" was intended to mean just that: any other law, whether enacted at the state or local level.
In concluding otherwise, the Supreme Court, among other things, relied upon Castine v Zurlo, a trial-level decision which determined that "any other law" means "any other state law" (Castine v Zurlo, 46 Misc 3d at 999-1001), while omitting any discussion of the only appellate decision on point, which reached a different conclusion (see City of New York v New York City Bd. of Elections, 1991 WL 12018167, *2, 1991 NY Misc LEXIS 895, *4-5). The Castine court reasoned that "the language 'any other law' was intended to reference any other state law—not any other law whatsoever, including local law"—because "'the education law' referenced in [the first bill] is a state law and [the second bill] was not intended to make any substantive changes" thereto (Castine v Zurlo, 46 Misc 3d at 1001). However, the Castine court erred in its analysis of the legislative history, construing two documents contained therein—a memorandum from the New York State Board of Elections and a letter from the League of Women Voters—as relating solely to the second bill, even though those documents pertained to both the first and second recodification bills (see State Bd of Elections Mem and League of Women Voters Mem, Bill Jacket, L 1976, ch 234 at 9-10, 12). Indeed, each document references the Assembly bill numbers for both the first bill and the second bill (see id.). Whether particular language in each document pertains to the first bill or the second bill, or both, therefore depends on the context, and it is plain from the context that the language quoted by the Castine court related to the recodification effort as a whole, not the changes made by the second bill to the first bill's recodification. In my opinion, based on this misapprehension, the Castine court reasoned that "any other law" was not intended to make any substantive change to "education law," a state law, even though the relevant language in the legislative history making that point pertained broadly to the recodification effort. The Supreme Court made the same mistake in its analysis of the legislative history in a manner nearly verbatim to the language in Castine v Zurlo (46 Misc 3d at 1000-1001). Notably, the Supreme Court and the Castine court each cited a letter from the Association of the Bar of the City of New York concerning the second bill and stating that "'[t]he amendments are minor in nature and for the most part intended to correct defects in the new law'" (id. at 1001, quoting Letter from Assn of Bar of the City of NY, Bill Jacket, L 1976, ch 234 at 11). This letter therefore supports the conclusion that the [*17]phrase "education law" as contained in the first bill was likely a typographical error.
Contrary to the plaintiffs' contention, a subsequent 1978 amendment to Election Law § 1-102 does not shed light on whether "any other law" means what it says, or whether it should instead be interpreted as "any other state law" (see L 1978, ch 374). That amendment served to clarify that the Election Law did "not apply to the conduct of school district, fire district, sewer district[,] and other special district elections" (Assembly Memo in Support, Bill Jacket, L 1978, ch 374 at 6). The Legislature never intended for the Election Law to apply to such elections, but confusion had arisen regarding its scope, necessitating the clarification (see id.). This amendment does not provide any indication whether, in circumstances where the Election Law applies, only the New York State Legislature may adopt laws inconsistent with it, or whether local governments may also do so.
In addition to asserting that the Supreme Court was correct to rely upon Castine v Zurlo, the plaintiffs argue that the First Department's determination in Matter of Makhani v Kiesel (211 AD3d 132) supports their interpretation of the phrase "any other law" as used in Election Law § 1-102. In that case, the court construed the phrase "any other department, authority, division[,] or agency of the state" as referring exclusively to entities within the executive branch, even though the statute in question did not explicitly state as much (Matter of Makhani v Kiesel, 211 AD3d at 141). To reach this determination, the court, inter alia, relied upon textual cues in the statute that revealed the Legislature's intent (see id. at 141-143). The Court of Appeals did the same in Bank of Am., N.A. v Kessler, a decision raised by the plaintiffs on this issue for the first time at oral argument before this Court, interpreting the statutory phrase "any other mailing or notice" in RPAPL 1304 as referring to any other mailing or notice "of a different kind" than the type of notice at issue in the statute (Bank of Am., N.A. v Kessler, 39 NY3d at 324-325). By contrast, Election Law § 1-102 contains no textual clues indicating that "any other law" means "any other state law." Contrary to the plaintiffs' contention, the statute's reference to "specific provision[s] of law . . . in any other law which [are] inconsistent with the provisions of this chapter," i.e. inconsistent with the Election Law (Election Law § 1-102), does not support their reading. The fact that the statute refers to laws that are inconsistent with a state statutory scheme, i.e., the New York State Election Law, does not raise an inference that the Legislature was referring solely to state laws and not local laws.
Since the language of the statute is unambiguous and the legislative history contains no clear evidence supporting a contrary interpretation, the phrase "any other law" as used in Election Law § 1-102 includes local laws (see People v Talluto, 39 NY3d 306, 314; Kuzmich v 50 Murray St. Acquisition LLC, 34 NY3d 84, 92-95; Matter of Ly v New York City Empls. Retirement Sys., 189 AD3d 1410, 1412-1413). Election Law § 5-102 prohibits noncitizens from voting, but contains no language stating that it "shall apply notwithstanding any other provision of law" (id. § 1-102). Therefore, Election Law § 1-102 permitted New York City to enact local legislation inconsistent with section 5-102 and to expand the franchise in local elections to qualifying noncitizens.
To the extent that the plaintiffs argue that the construction of "any other law" urged by the defendants might have wide-ranging effects by allowing localities to disregard the requirements of the Election Law, "the Legislature is best suited to evaluate and resolve" those concerns (Matter of Amorosi v South Colonie Ind. Cent. School Dist., 9 NY3d at 372 [internal quotation marks omitted]; see Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 107). Moreover, the defendants' construction of section 1-102 allows municipalities to deviate from the Election Law only in circumstances pertaining to local matters and does not allow a municipality to expand the franchise with regard to statewide officers or questions (see NY Const, art IX, § 2[c]; Municipal Home Rule Law § 10[1]).
4. The Noncitizen Voting Law Was Not Subject to a Mandatory Referendum Pursuant to Municipal Home Rule Law § 23(2)(e).
"[The] Court of Appeals has made clear that local governments have broad power to enact local laws, and direct democracy in New York is the exception, not the rule" (Molinari v Bloomberg, 564 F3d 587, 609 [2d Cir], citing Matter of McCabe v Voorhis, 243 NY 401, 413). Among other reasons for this, if too many "local laws" were subject to "a mandatory referendum[,] . . . there would be more referendums than any community could well manage" (Mayor of City of N.Y. v Council of City of N.Y., 9 NY3d 23, 33). A law enacted by a local legislative body that is subject to a mandatory referendum "lacks operative effect until presented to and approved by the voters" (Hoehmann v Town of Clarkstown, 40 NY3d 1, 6; see Municipal Home Rule Law § 23[1]). In other words, "[w]here a referendum is required, but is not held, the local law is invalid" (Matter [*18]of Gizzo v Town of Mamaroneck, 36 AD3d 162, 166). Municipal Home Rule Law § 23 sets forth the types of local laws subject to a mandatory referendum in New York. As relevant here, "[Municipal Home Rule Law] § 23(2)(e) requires a referendum," among other circumstances, "when a proposed law would change the method of . . . electing . . . an elective officer" (Matter of McArdle v City of Yonkers, 217 AD3d 907, 910).
Contrary to the plaintiffs' contention, it is my view that the Supreme Court improperly determined that the noncitizen voting law was subject to a mandatory referendum pursuant to Municipal Home Rule Law § 23(2)(e). The court reasoned, inter alia, that the law "fundamentally changed" "the method by which all municipal elective officers are elected" because it "increas[ed] the number of individuals in the electorate by permitting non-citizens to vote." However, the court failed to explain how an increase in the size of the electorate necessarily changes the method of conducting elections of local elective officers. Municipal Home Rule Law § 23(2)(e) "cannot sensibly be read to subject" the noncitizen voting law "to a mandatory referendum" (Mayor of City of N.Y. v Council of City of N.Y., 9 NY3d at 33).
As the majority indicates, the Municipal Home Rule Law does not define the term "method" as used in section 23(2)(e), either in that section or elsewhere in the statute (see e.g. Municipal Home Rule Law § 2), and there does not appear to be any appellate precedent defining the scope of the term. "Courts generally construe words of ordinary import with their usual and commonly understood meaning, unless the Legislature by definition or from the rest of the context of the statute provides a special meaning" (People v Witherspoon, 211 AD3d at 114 [citation and internal quotation marks omitted]). "When statutory terms are not defined, dictionary definitions serve as useful guideposts in determining the word's ordinary and commonly understood meaning" (People v Williams, 37 NY3d 314, 318 [internal quotation marks omitted]). The term "method" has been defined as "[a] mode of organizing, operating, or performing something, esp[ecially] to achieve a goal" (Black's Law Dictionary [11th ed 2019], method), while "mode" refers, among other things, to the "manner of behaving, living, or doing something" (Black's Law Dictionary [11th ed 2019], mode). "Method" has also been defined as "a way, technique, or process of or for doing something" (Merriam-Webster.com Dictionary, method [https://www.merriam-webster.com/dictionary/method]). With these definitions in mind, the noncitizen voting law, in my view, does not change the method of electing local elective officers in New York City. The law does not contain any provisions, for example, impacting the secret ballot process (see Election Law § 8-300[2]); the manner of ascertaining whether a voter is entitled to vote before permitting him or her into the voting area (see id. § 8-300[1]); the procedure for providing assistance to voters who ask for it at a polling place (see Election Law § 8-306); the protocol for casting write-in ballots (see id. § 8-308); or the process for ranked-choice voting in the City primary elections or other elections where it may be applicable (see NY City Charter § 1057-g). Pursuant to the noncitizen voting law, the process for conducting elections of local officers is unchanged. The law broadens the scope of persons who may participate in that process without changing the process itself. Regardless of whether the law constitutes a significant change to electoral politics in the City by expanding the pool of eligible voters, it does not constitute a change to the method of electing local officers.
In addition to the fact that they are nonbinding on this Court, the informal opinions of the New York State Attorney General's Office cited by the plaintiffs are distinguishable and therefore do not warrant a different result. The plaintiffs rely upon an opinion asserting that "changes [to] the requirement of enrollment, form of petition, number of signatures required, etc., together constitute[d] a change in method of nominating elective officers of" a city (1967 Atty Gen [Inf Ops] 73, 1967 WL 157112, *2 [emphasis omitted]). But these items are plainly related to the process of electing local officers, in contrast to the noncitizen voting law's change to voter qualifications. The plaintiffs also cite another informal opinion relating, inter alia, to a "proposed change" in a city's " method of selection of the Acting City Judge from appointment by the Mayor to election by the people" (1966 Atty Gen [Inf Ops] 71, 1966 WL 146388, *2). While the plaintiffs assert that it supports their position, this opinion concluded that the proposed change was subject to a mandatory referendum pursuant to Municipal Home Rule Law § 23(2)(f) "in that it would abolish the power of an elective officer, . . . the Mayor . . . , and would, therefore, be subject to mandatory referendum," without considering Municipal Home Rule Law § 23(2)(e) (1966 Atty Gen [Inf Ops] 71, 1966 WL 146388, *2).
My colleagues in the majority assert that since section 1057-bb(a) of the New York City Charter entitles noncitizen voters to the "same rights and privileges as U.S. citizen voters with regard [*19]to municipal elections," it follows that the noncitizen voting law, in allowing noncitizens to vote, would also allow noncitizens to run and hold any position for which they are eligible to vote. Initially, it is unclear to me how this conclusion is relevant to the issue of whether a mandatory referendum was required under Municipal Home Rule Law § 23(2)(e). More importantly, the plaintiffs have not challenged the law on this basis, and no party or amicus curiae raised this argument at any stage of the litigation. As counsel for the City defendants indicated at oral argument before this Court, this issue should be "decided on another day," since it has not been litigated by the parties and is not properly before this Court. It is well established that this Court is "not in the business of blindsiding litigants, who expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made" (Rosenblatt v St. George Health & Racquetball Assoc., LLC, 119 AD3d 45, 54 [internal quotation marks omitted]).
I also question the majority's conclusory statement that the noncitizen voting law "would have significant implications beyond permitting noncitizens to vote," when the "rights and privileges" language cited in section 1057-bb(a) of the New York City Charter appears to relate solely to voting. I fail to see how that language can be read as allowing noncitizens to run for office.[FN2]
Because Municipal Home Rule Law § 23(2)(e) does not require that a local law modifying the qualifications of voters in local elections must be presented to and approved by the voters of the City, the noncitizen voting law was not subject to a mandatory referendum pursuant thereto.
5. Conclusion
In my view, the plaintiffs failed to establish that the noncitizen voting law violates the New York State Constitution beyond a reasonable doubt, especially considering that the provisions of article IX must be liberally construed in favor of municipalities. Although local legislators and officers must be elected by "the people" of a municipality, the plaintiffs have not shown beyond a reasonable doubt that municipalities are constitutionally restricted from allowing anyone other than citizens of the United States to vote in local elections. Moreover, contrary to the plaintiffs' contention, the City's government was permitted to enact legislation inconsistent with Election Law § 5-102 in light of the plain language of Election Law § 1-102. The plaintiffs have also failed to demonstrate that the noncitizen voting law was subject to a mandatory referendum pursuant to Municipal Home Rule Law § 23(2)(e), since the law did not change the method of electing local elective officers, even if it expanded the class of persons eligible to participate in the process of electing such officers. In my view, the City's government acted within the constraints of its constitutional and statutory authority in granting the right of suffrage to noncitizens legally residing in the City, affording them a political voice in the communities that they call home. By affirming the Supreme Court's determination, the majority rejects the choice of the duly elected representatives of the City's people to grant nearly one million residents the right to vote, disenfranchising those [*20]residents in the process. Accordingly, I would reverse the order, grant the City defendants' motion for summary judgment dismissing the complaint insofar as asserted against them and, in effect, declaring that the noncitizen voting law is lawful and valid, grant the intervenors' motion, inter alia, for summary judgment dismissing the complaint insofar as asserted against them and, in effect, declaring that the noncitizen voting law is lawful and valid, deny the plaintiffs' motion for summary judgment declaring the noncitizen voting law null and void on the grounds that it violates the New York State Constitution, the New York State Election Law, and the Municipal Home Rule Law and permanently enjoining the implementation and enforcement of that law, and remit the matter to the Supreme Court, Richmond County, for the entry of a judgment, inter alia, declaring that the noncitizen voting law is lawful and valid.
ENTER:
Darrell M. Joseph
Acting Clerk of the Court

Footnotes

Footnote 1: Intervenor Muhammad Shahidullah subsequently withdrew his appeal.

Footnote 2: Interestingly, the majority does not cite Election Law § 6-122, which states that "[a] person shall not be designated or nominated for a public office or party position who," among other things, "is not a citizen of the state of New York" (emphasis added). An interpretation of this provision of the Election Law might alleviate the majority's concern about noncitizens running for office. Ultimately, though, since this issue is not before this Court, we have no occasion to consider the question.
I also note that the issue of whether the noncitizen voting law would permit noncitizens to run for the same offices for which they are entitled to vote came up once during the City Council meeting and vote on the noncitizen voting law held on December 9, 2021. At that meeting, Council Member James Gennaro, who ultimately voted "no" on the bill, appeared to be operating under the assumption that a noncitizen voter was precluded from running for the offices for which he or she could cast a vote:
"[T]o me, there's a fundamental unfairness that is introduced when you tell a resident of New York City, a permanent resident, that they now will be bestowed with the privilege of voting for local—for local government officials, but they don't have the ability to run for those offices. So we're telling them that you're good enough to vote, but not good enough to hold office."